**In re The SOUTHLAND CORPORA-TION, Debtor-in-Possession.**

**Bankruptcy No. 390–37119–HCA–11.**

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

March 1, 1991.

J. Michael Sutherland of Vinson & El-kins, Dallas, Tex., Alesia Ranny Marinelli and Tom Allingham of Skadden Arps Slate Meager & Flom, Wilmington, Del., for debtor.

James E. Spiotto of Chapman and Cutler, Chicago, Ill. for Official Bondholders Committee.

Paul D. Wolfson of Milgrim, Thomajan & Lee P.C., New York City, for Unofficial Bondholders Committee.

Henry Simon of Simon, Anisman, Doby, Wilson & Skillern, Fort Worth, Tex., for Preferred Shareholder Group.

John Lee, for Securities & Exchange Com'n.

MEMORANDUM OPINION INVALIDATING ACCEPTANCE OF PRE–PACKAGED PLAN * OF REORGANIZATION

HAROLD C. ABRAMSON, Bankruptcy Judge.

As a preliminary matter, the Court finds this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (L). The following represents the Court's findings of fact and conclusions of law enunciated on the record during the Confirmation Hearing convened on December 14, 1990, and continued on various dates thereafter, which are further expanded for the purposes of

* A popular term used in today's bankruptcy par-        lance.

this Memorandum Opinion. The findings herein although in narrative form are intended to comply with Federal Rules of Bankruptcy Procedure 7052.

## I. FACTUAL BACKGROUND

Counsel for the Debtor in their Memorandum, summarize the background of the bankruptcy filing as follows:

The Southland Corporation ("Southland"), conducting business principally under the name 7–Eleven, is the largest convenience store chain in the world, with almost 13,000 owned and franchised stores worldwide. Southland also licenses approximately six hundred seventy-nine 7–Eleven stores and owns five distribution centers and six food processing centers that serve its stores and unaffiliated customers.

On December 15, 1987, JT Acquisition Corporation completed a $4.9 billion acquisition of Southland pursuant to a leveraged buyout transaction (the "Acquisition" or "LBO"). To finance the Acquisition, Southland borrowed approximately $2.5 billion in secured term loans and raised $1.5 billion from the sale of debt securities and warrants to purchase Southland's common stock. In connection with the Acquisition, Southland also issued preferred stock as part of the consideration to be paid to certain former public shareholders of Southland. In each case, would-be holders of Southland's LBO-issued securities and debt (*i.e.*, the bank debt, public bond debt, and preferred stock issued in consideration of or to finance the LBO) were informed of the use of the proceeds of the borrowings and were advised of the fraudulent transfer risks connected with the debt and the securities. It is primarily this debt and these securities that are being restructured under Southland's Plan.

### A. *Initial Restructuring Discussions*

By late 1989, Southland recognized that it could not make the large capital expenditures it would need to compete effectively because of its debt load and restrictive covenants in its credit agreements.

Accordingly, Southland and its financial advisor, Drexel Burnham Lambert Incorporated ("DBL"), began exploring possible alternatives for easing the restrictive covenants and reducing the overall amount of Southland's indebtedness, through various exchange offers directed to holders of Southland's outstanding public debt securities (the "Old Debt Securities") and preferred stock (the "Old Preferred Stock" and, collectively with the Old Debt Securities, the "Old Securities"). Under the exchange offers, holders of Southland's Old Securities would be asked to exchange their Old Securities for a lesser amount of new debt securities (the "New Debt Securities"), shares of Southland's common stock (the "New Common Stock" and, collectively with the New Debt Securities, the "New Securities"), and/or cash.[1]

In October and November of 1989, DBL began contacting third parties regarding possible participation in a restructuring transaction with Southland. To assist third parties in deciding whether, and on what terms, they were interested in participating in Southland's restructuring efforts, Southland provided information on a confidential basis to various interested parties. From November 1989 to January 1990, Southland engaged in discussions with Shamrock Capital Advisors, Inc. ("Shamrock") and its representatives concerning the possibility of a transaction between the parties. The discussions led to a letter agreement on February 19, 1990, pursuant to which the parties agreed to use their best efforts to negotiate a mutually acceptable restructuring of Southland.

Throughout February and March, 1990, Southland continued to negotiate terms of a possible restructuring with Shamrock. In addition, Southland, Seven–Eleven Japan and Ito–Yokado Co., Ltd., the corporate of Seven–Eleven Japan ("Ito–Yokado"), continued their discussions. Contemporaneously, Merrill Lynch Capital Markets ("Merrill Lynch"), financial advisors to Sev-

---

**1.** On November 9, 1989, Southland filed confidential preliminary materials with the Securities and Exchange Commission (the "SEC") relating to the above described exchange offers.

en–Eleven Japan and Ito–Yokado, and Shearman & Sterling, counsel to Seven–Eleven Japan, and Ito–Yokado, performed extensive business and legal due diligence on Southland.

## B. *The Purchaser's Proposal; the Stock Purchase Agreement*

In March 1990, Seven–Eleven Japan and Ito–Yokado proposed to acquire a controlling interest in Southland, conditioned upon the consummation of exchange offers for the Old Securities. During March 1990, Southland negotiated the terms of Seven–Eleven Japan's proposal with Merrill Lynch, and Seven–Eleven Japan modified its proposal several times.

On March 21, 1990, after negotiations, Southland entered into a stock purchase agreement with Ito–Yokado and Seven–Eleven Japan (collectively, the "Purchaser") whereby Southland agreed to sell approximately 75 percent of its New Common Stock to the Purchaser for $400 million, conditioned upon the consummation of exchange offers for the Old Securities. On or about that date, Southland publicly announced its agreement with the Purchaser, thus commencing the highly publicized phase of its restructuring negotiations. As a result of its agreement with the Purchaser, Southland terminated its letter agreement with Shamrock.

## C. *Initial Proposals*

On April 9, 1990, Southland filed a registration statement on Form S–4 with the Securities and Exchange Commission (the "SEC") with respect to the securities to be issued in the exchange offers. Southland proposed to offer new zero coupon debt securities and New Common Stock to holders of the Old Debt Securities, and new preferred stock and New Common Stock to holders of the Old Preferred Stock. The stock purchase agreement with the Purchaser was amended to reflect the terms of the April Proposal. Southland mailed copies of its preliminary prospectus containing the April Proposal (filed as part of the Form S–4) to holders of the Old Securities immediately thereafter. Following the mailing, between April 18 and May 2, 1990, Merrill Lynch and Donaldson Lufkin & Jenrette Securities Corporation ("DIJ")[2] met with approximately thirty holders of the Old Debt Securities to discuss the terms of the April Proposal and the New Debt Securities and Southland's financial condition. The general response of those holders to Southland's proposal was negative.

## D. *Formation of and Initial Negotiations with the Steering Committee; Deterioration in Southland's Condition*

In early April 1990, a committee of holders of Southland's Old Securities (the "Committee") was formed to seek to maximize the value such holders would obtain in any restructuring. A steering committee of Committee members (the "Steering Committee") was formed to negotiate with Southland and the Purchaser.[3] Steering Committee members agreed to restrict their trading in Southland's securities so that they could receive material, non-public information regarding Southland. In part to avoid restrictions on their trading, many members of the original Steering Commit-

---

**2.** Southland terminated its agreement with DBL on or about March 20, 1990 after DBL's parent entity filed a chapter 11 case. On April 4, 1990, Southland entered into an agreement with DLJ to act as financial advisor to Southland and Dealer Manager for its proposed exchange offers. A few days later, on April 6, 1990, Southland also entered into an agreement with Merrill Lynch to act as financial advisor to Southland and the Purchaser and to act as Dealer Manager in connection with the proposed exchange offers.

**3.** The Steering Committee informed Southland that as of April 16, 1990, (a) its members held at least $400,000,000 principal amount and liquidation preference, as the case may be, of the Old Debt Securities and the Old Preferred Stock, and (b) the Committee generally, to the best of its knowledge, held over 50 percent of the Old Debt Securities and Old Preferred Stock. (When used in reference to Southland's 16½ percent Senior Subordinated Discount Notes due December 15, 1997, and its 18 percent Junior Subordinated Discounted Debentures due December 15, 2007, "principal amount" refers to accreted value.) *See* April 16, 1990 Agreement among Southland, the Steering Committee and Kidder, Peabody & Co., Incorporated.

tee resigned. Ultimately, the Steering Committee consisted of Broad Inc., Deltec Securities Corporation, Kemper Financial Services, Inc., Presidential Life Insurance Company and California Public Employee Retirement System.[4]

On or about April 13, 1990, the Steering Committee chose Kidder, Peabody & Co., Incorporated ("Kidder Peabody") as its financial advisor, and Chapman and Cutler as its legal advisor.

Following the engagement of these advisors, they and the Steering Committee began a due diligence review of Southland. As detailed in a committee report, the Steering Committee and its advisors conducted "a critical review of [Southland's] forecasts, a valuation analysis of [Southland], an analysis of [Southland's] proposed exchange offers and the preparation of counterproposals thereto, an analysis of alternative restructuring proposals (including proposals without a cash infusion by Ito–Yokado), an analysis of and meetings with Ito–Yokado, a critical analysis of [Southland's] management, a critical analysis of [Southland's] operations, investments, assets, liabilities and expenses, and meetings with [Southland's] management and financial advisors ..." Committee Report, pages 11–14.

As Southland and the Steering Committee negotiated throughout the Spring, Summer and Fall of 1990, and Southland's financial condition and business relationships in particular, deteriorated, thus threatening the viability of Southland and its agreement with the Purchaser. Franchisees, upon whom Southland was dependent for cash, grew concerned and relationships were strained. Commencing with Southland's March 22 announcement of the stock purchase agreement and continuing up to the time of Southland's Chapter 11 filing, Southland's creditors tightened trade terms and, in some cases, put Southland on "cash on delivery" terms. Bondholders sued when Southland failed to pay interest due on certain bonds in June of 1990.[5] Southland's automated clearinghouse system ("ACH")—the means by which much of the cash generated at individual stores and deposited at local banks [6] is upstreamed to a concentration account—was terminated in September by NCNB Texas, one of its main cash management banks. ACH was in danger of being terminated in October by the First National Bank of Chicago, its major cash concentration account bank. By August and September, Southland's cash position had further deteriorated.

### E.  The Steering Committee's Counterproposal; Amendments to Exchange Offers

Kidder Peabody valued the April Proposal at approximately $340 million and informed the Steering Committee that this amount of consideration was inadequate.

On May 30, 1990, the Steering Committee made a counterproposal to Southland on terms more beneficial to the Old Securities holders than those made by Southland in the April Proposal. The counterproposal also demonstrated the importance to the Steering Committee of ensuring that any restructuring would be binding on most of the holders of Old Securities. Concerned that non-tendering holders (referred to colloquially as the "stub") would receive a windfall at the expense of those who tendered, the Steering Committee indicated it would not countenance a restructuring that permitted a large stub to remain outstanding after consummation of the exchange offers.[7] Accordingly, the Steering Commit-

---

4. See "Report of the Official Bondholders' Committee Regarding Formation of Prepetition Ad Hoc and Steering Committees of Security Holders, Selection of Financial Advisors and Legal Counsel, Results of Due Diligence Investigation, and Negotiation of Exchange Offer and Prepackaged Plan" dated November 22, 1990 (hereinafter, the "Committee Report") pp. 5–8.

5. The grace period for making the interest payment expired on July 15, 1990. Suit was filed on July 16, 1990.

6. The local banks are for deposits only. The way Southland's cash management system was set up, that cash was not available for use by Southland until it was transferred to a concentration account.

7. A "stub" holder receives a windfall because he retains his pre-exchange offer security, which

tee insisted that tenders by Steering Committee members would be conditioned upon at least 95 percent of the outstanding amount of Old Debt Securities in each tranche being tendered. This took away Southland's and the Purchaser's ability to waive the 95 percent requirement that they had proposed in the event of significant, but less than 95 percent, tenders in each tranche. The Steering Committee also suggested a pre-packaged plan of reorganization as one way to insure participation by an acceptably high percentage of holders.[8] Southland, however, desired to complete its restructuring outside of bankruptcy, if at all possible. More importantly, the Purchaser was at that time unwilling to discuss a pre-packaged plan.

In early June 1990, after discussions with its financial advisors and the Purchaser, Southland indicated to the Steering Committee that it was willing to increase the overall consideration to be offered to holders of the Old Securities from the amount it had offered in the April Proposal. On June 14, 1990, Southland publicly announced its revised restructuring proposal (the "June Proposal"). The new proposal provided that Southland would offer (i) holders of Old Debt Securities $550 million in aggregate principal amount of New Debt Securities that paid cash interest currently, and (ii) holders of Old Securities 18.5 percent of the New Common Stock of Southland (as compared to 10 percent of the New Common Stock that had been offered previously). Southland's June Proposal reduced its existing common shareholders' equity stake in the restructured company from the level provided by the April Proposal (15 percent) to 6.5 percent.

On the day that it announced the June Proposal, Southland announced that it would not make the interest payments due on certain of its Old Debt Securities. Although Southland had continued to meet its other obligations, it determined that the interest payments should not be made because of its deteriorating cash position. The indentures governing the Old Debt Securities afforded Southland a 30-day grace period within which to make its interest payments; at the expiration of the grace period (*i.e.*, on July 15, 1990), Southland's failure to pay the interest would become an event of default.

On July 2, 1990, Southland filed an amendment to its registration statement reflecting the terms of the June Proposal; it was declared effective by the SEC on July 3. Shortly thereafter, Southland commenced its exchange offers reflecting these terms by mailing definitive solicitation materials to holders of its Old Securities. The stock purchase agreement with the Purchaser was terminated and a new agreement was entered into reflecting the terms of the June Proposal.

### F. *Negotiations Leading to July Proposal*

Kidder Peabody valued the June Proposal at approximately $605 million, and the Steering Committee once again rejected Southland's proposed restructuring.

Southland was aware that its failure to make the June 15 interest payments on or before the expiration of the 30-day grace period on July 15, 1990 would precipitate a major financial crisis *unless* it were accompanied by good news—*i.e.*, by news that Southland had reached an agreement in principle with the Steering Committee concerning the economic terms of a restructuring. Southland feared that its continued failure to pay interest, particularly if coupled with lack of progress in its restructur-

---

has two advantages: (i) it has a higher principal and interest rate than the new securities received by tendering holders, and (ii) by virtue of the concessions in principal and interest made by tendering holders, that old security is now the obligation of a stronger, healthier company.

**8.** Investors who do not tender in an exchange offer often do so hoping to retain stub securities and thus achieve economic benefits not avail-

able to—and made possible by—those who tendered. By binding *all* creditors, a prepackaged plan eliminates the "stub" problem and treats all creditors within a class alike. Thus, non-tenders (like the members of the so-called unofficial bondholders committee) cannot receive better treatment for themselves at the expense of their fellow bondholders. Chapter 11 eliminates their windfall.

ing negotiations, would create uncertainty among Southland's suppliers and franchisees. That uncertainty would be heightened further by Southland's failure to reduce its revolving credit agreement obligations to $50 million on July 16, 1990, as required by the terms of that agreement. In addition, failure to pay interest by the end of the grace period constituted an event of default under the indentures governing such Old Debt Securities. Other debt instruments of Southland and its subsidiaries contained cross-default and cross-acceleration provisions which would permit the holders of such indebtedness to accelerate their indebtedness, adding further to Southland's cash flow problems.

Southland, therefore, believed it was imperative to reach and publicly announce an agreement in principle with the Steering Committee by Monday, July 16, 1990, in order to preserve its relationships with its suppliers, customers, franchisees and area licensees and to reduce the likelihood that it would become the subject of a bankruptcy case. During the week of July 9–16, 1990, Southland continued to negotiate with the Steering Committee and its advisors, and also conducted negotiations with the major bondholders regarding the economic terms of the June Proposal.[9]

On July 11, 1990, the Purchaser agreed to reduce its equity stake in Southland from 75 percent to 70 percent of the New common Stock, and Southland agreed to distribute this additional 5 percent equity stake to the holders of the Old Securities as a component of its exchange offers. Kidder Peabody valued this new proposal at approximately $614 million, but the Steering Committee still refused to support Southland's restructuring proposal.

With the end of the grace period rapidly approaching and its cash position deteriorating, Southland once again increased the principal amounts of all New Debt Securities offered, and, in addition, offered $57 in cash for each $1,000 aggregate principal amount of Old Senior Notes[10] tendered. The Purchaser agreed to increase its price for 70 percent of the New Common Stock to $430 million, an increase of $30 million. The equity stake of Southland's existing shareholders in the restructured company was further reduced from 6.5 percent to 5 percent, and the equity foregone by the existing shareholders was reallocated to the holders of the Old Securities. At this point, Southland believed that it had reached a tentative agreement with the Steering Committee as to the key economic terms of the restructuring and agreed to reconvene on July 15 to discuss the terms of the indentures relating to the New Debt Securities (the "New Indentures"). However, on July 15, 1990, the Steering Committee demanded that Southland provide sinking fund payments for certain New Debt Securities. Southland rejected this demand and, after heated discussions, the parties terminated negotiations, with no agreement in principle having been reached and the end of the grace period only hours away.

The parties reconvened at 3:00 a.m. on July 16, 1990. By the end of what proved to be unpleasant and acrimonious negotiations, Southland had agreed to the Steering Committee's demand for sinking fund payments, and had agreed to include a change of control put option in each of the New Indentures. Finally, Southland and the Steering Committee had reached an agreement in principle as to the economic terms of Southland's restructuring plan.[11] Kidder Peabody valued this final proposal at approximately $710 million.

9. Southland contacted Martin Whitman of Whitman, Heffernan & Rhyne, an investment advisory firm which owned a significant percentage of Southland's 13½ percent Senior Extendible Reset Notes due December 15, 1997 (the "Old Senior Notes"), and which claimed to represent other holders of the Old Senior Notes. Southland also negotiated with representatives of Carl Icahn, who through a number of affiliates, owned a significant percentage of each issue of Old debt Securities.

10. The Old Senior Notes are the most senior tranche of Southland's public debt.

11. Southland, its bank creditors, and the Steering Committee conducted negotiations concerning covenants and other terms of the New Debt Securities throughout July and early August.

On July 16, 1990, Southland announced that it had reached an agreement in principle with the Steering Committee on the economic terms of a restructuring plan. The agreement contemplated (i) the acquisition by the Purchaser of 70 percent of Southland's New Common Stock for $430 million and (ii) as compared to the June Exchange Offers, increased aggregate principal amounts of New Debt Securities to be offered to holders of the Old Debt Securities, a new cash payment to holders of Old Senior Notes, and an increased percentage of New Common Stock to be offered to holders of the Old Securities.

On July 23, 1990, Southland filed a new registration statement reflecting the terms of the July Proposal. The stock purchase agreement with the Purchaser was also amended and restated to reflect the revised terms.

On August 2, 1990, Southland, responding to SEC comments, filed an amendment to its registration statement. The SEC ultimately declared the registration statement effective, and on August 2, 1990, Southland commenced mailing the prospectus relating to the July Proposal (the "August Prospectus") and other definitive solicitation materials containing the July Proposal to holders of the Old Securities.

### G. Materials Relating to the Plan

Even though the Purchaser had not agreed to participate in a bankruptcy reorganization, the Steering Committee's approval of the July Proposal was conditioned upon Southland's agreement to file preliminary materials with the SEC relating to the solicitation of acceptances of a pre-packaged plan of reorganization. Southland was required to make this "silent filing" [12] within two weeks of the date upon which it commenced mailing solicitation materials relating to the July Proposal. Southland's failure to file such materials would have permitted the Steering Committee to revoke its approval of the July Proposal.

Between August 2 through August 16 (at the same time it was soliciting tenders for the July Proposal in the hope of avoiding bankruptcy), Southland and the Purchaser prepared the Reorganization Plan. On August 16, 1990, Southland filed preliminary *confidential* proxy materials with the SEC which included a description of the said Plan and proposed solicitation of acceptances of the said Plan.

On September 25, 1990, Southland determined that it had not received and most likely would not receive the tenders necessary to effectuate its July Proposal. Southland concluded that the exchange offers and its restructuring might have to be consummated as part of a bankruptcy reorganization. Following a series of discussions, Southland and the Purchaser terminated the then-existing stock purchase agreement and soon thereafter entered into another stock purchase agreement which permitted Southland (a) to offer a cash election option to holders of relatively small aggregate principal amounts of Old Debt Securities,[13] (b) to pay certain dealers for successfully soliciting *tenders* of Old Debt Securities, and (c) to solicit acceptances of its pre-filing plan. Although the Purchaser informed Southland that its present intention was to consummate the stock purchase agreement in a pre-filing plan context, the Purchaser was unwilling to modify the stock purchase agreement in September to permit Southland to actually *file* its bankruptcy. If it became necessary to file a bankruptcy, the Purchaser advised Southland that it would review all of the circumstances then existing to determine whether, and under what conditions, it would participate in Southland's restructuring and consummate its purchase of New Common Stock.

On September 26, 1990, Southland filed a post-effective amendment to the registration statement relating to the July Proposal, thereby proposing to incorporate the Plan into its exchange offers and making

12. A "silent filing" is not publicly available.

13. Southland initially wanted to make the cash-out option available to holders of $500,000 or less in aggregate principal amount of Old Debt Securities, but Kidder Peabody, on behalf of the Steering Committee, demanded a lower threshold. In response, Southland lowered the threshold from $500,000 to $300,000.

the terms of the Plan public.[14] The proxy statement-prospectus contained in the amendment provided for the above-described cash elections and payments to soliciting dealers. Southland issued a press release announcing, among other things, its continuing solicitation of tenders and of acceptances of the Plan.

### H. *The Filing of the Bankruptcy Petition*

On October 4, 1990, the post-effective amendment relating to the Plan was declared effective by the SEC (this post-effective amendment will be referred to herein as the "October Prospectus" or "October Solicitation"). Although dated October 5, 1990, Southland began mailing on or about October 9th or 10th to holders of the Old Securities, a prospectus requiring tender of Old Securities by October 22, close of business. (That date was extended at some point to October 23, 1990 to allow Southland additional time to negotiate amendment to the Stock Purchase Agreement with the Purchaser.)

On either October 22 or 23, 1990, the final exchange offers and the solicitation period for acceptances of the Plan expired. At the expiration, Southland had not received the requisite number of tenders to consummate the final exchange offers, but it allegedly obtained sufficient acceptances of the Plan to seek confirmation of the Plan by the Court. On October 23, 1990, after further negotiations and discussions, Southland and the Purchaser terminated the stock purchase agreement and entered into a new stock purchase agreement, the economic terms of which remained the same as those of the previous stock purchase agreement, but which allowed Southland to file the Plan with the bankruptcy court (the "Stock Purchase Agreement").

The case was filed by Southland entities on October 24, 1990. The confirmation hearing began on December 14, 1990. The issue before the Court is the validity of a vote obtained for acceptance of a (pre-filing) plan of reorganization.

A report filed with the Court on November 30, 1990, indicated that the Plan had been accepted by the following percentages of both number and amount of each class of Old debt Securities[15] :

| Class | | % Number | % Amount |
|---|---|---|---|
| Class 5 | (Old Senior Notes) | 87% | 97% |
| Class 6 | (Old Senior Subordinated Notes) | 70% | 96% |
| Class 7 | (Old Senior Subordinated Discount Notes) | 81% | 99% |
| Class 8 | (Old Subordinated Debentures) | 80% | 82% |
| Class 9 | (Old Junior Subordinated Debentures) | 80% | 91% |
| Preferred Shares | | | 95.5% [16] |

14. Although the existence of a prepackaged plan was supposed to have been held in strictest confidence by all who knew about it, news of the plan reached the press as early as September 13, 1990. At trial, a member of the Committee testified that he told as many people as possible that a bankruptcy reorganization was inevitable, and the only feasible method of restructuring the bond debt.

15. The classes of Old Debt Securities are defined in Article III of the Plan of Reorganization. Class 5 is Southland's 13.5 percent Senior Extendible Reset Notes due December 15, 1995 and extendible to June 15, 1997 (the "Old Senior Notes"); Class 6, Southland's 15.75 percent Senior Subordinated Notes due December 15, 1997 (the "Old Senior Subordinated Notes"); Class 7, Southland's 16.5 percent Senior Subordinated Discount Notes due December 15, 1997 (the "Old Senior Subordinated Discount Notes"); Class 8, Southland's 16.75 percent Subordinated Debentures due December 15, 2002 (the "Old Subordinated Debentures"); and Class 9, Southland's 18 percent Junior Subordinated Discount Debentures due December 15, 2007 (the "Old Subordinated Debenture"). "Memorandum of the Southland Corporation in Support of Methodology Used to Determine Acceptance of Plan of Reorganization ..." at Page 4–5.

16. Memorandum of Law of the Official Bondholders Committee regarding the Debtor's Meth-

As proof of the vote and the overwhelming acceptance of its Plan, Southland offered the ballots and tabulation of ballots cast through Ms. Barbara Cumberland of Bankers Trust Co., the Ballot Agent.[17] The Debtor's tabulation is based upon the vote of *record holders* and, where the *record holder* was a depository or clearing house, the vote of participants. Southland reported results obtained by counting only the votes of *record holders*.

## II. THE VOTE OF RECORD HOLDERS

The vote of the record holders has been challenged by a self-styled "Unofficial Bondholders Committee" (the "Ad Hoc Committee"), which represents five investors who are dissatisfied with the voting process and the representation provided by the Steering Committee which now forms the Official Bondholders Committee (the "Committee").[18] The Debtor argues it is required to recognize only the vote of the record holder and contends that the Court should not and cannot delve into the authority of the record holder to cast such votes.[19] For reasons cited below, the Court find the reliance on the vote of record holders, in this case, questionable and ill conceived.

### A. *The Taint of the Record Holders' Vote*

■ The Debtor's solicitation of tenders at the same time, and in the same document as the solicitation of votes on a

bankruptcy plan, includes what the Court perceives to be an improper solicitation fee. The October Solicitation states:

> Upon acceptance for exchange ... of the Old Debt Securities, pursuant to the Debt Exchange Offers, the Company will pay each Soliciting Dealer ... (a) a fee of $5.00 for each $1,000 aggregate principal amount of an Old Debt Security validly tendered by a Designated Holder ... and (b) a fee of $2.50 for each $1,000 aggregate principal amount of an Old Debt Security validly tendered by any person or entity who ... holds an aggregate principal amount of more than $300,000 and less than or equal to $1,000,000 of an issue of Old debt Securities ... The Company will also indemnify the Soliciting Dealers (including the Dealer Managers as Soliciting Dealers) against certain liabilities, including liabilities under the Securities Act.

> Because the payment of fees for solicitation of tenders from Designated Holders and Specified Holders may create a conflict of interest for Soliciting Dealers, Designated Holders and Specified Holders are encouraged to consult their own tax, legal and business advisors before tendering their applicable issues of Old Debt Securities solely on the basis of a Soliciting Dealers advice.[20]

The solicitation fee is a clear conflict of loyalty between the broker and customer. The broker in so tendering, makes a fee from Southland *and* its customer. Furthermore, conflict becomes ruefully clear in

---

od of Tabulation of Record Holder's Vote at page 3.

**17.** See Appendix A attached to this opinion which was admitted at trial as Debtor's Exhibit 33 for a detailed description of the vote tabulation presented at trial.

**18.** On October 24, 1990, the date of the commencement of the case, the Steering Committee was approved by the U.S. Trustee as the Official Bondholder's Committee. The Steering Com-

mittee was formed in July 1990, following an initial offer by the Japanese investor.

**19.** At trial, the Debtor propelled the following arguments to defeat inquiry into the vote: (1) the record holders would not disclose the identity of the beneficial holders of the bonds; and (2) the choice by beneficial holders to allow the bond to be held by a third party subjects the beneficial holder to the peril that the bonds may not be voted according to instruction.

**20.** October Solicitation, p. 153.

the method of counting the votes. The tender of a bond without a "yes", "no", or "abstain" on the ballot was deemed a vote in favor of the Plan. Such a dual agency and possible self-interest created by the solicitation fee weighs heavily against the good faith of the votes. Most importantly, the evidence failed to connect the authority of the record holders to cast any votes on the Plan; the Debtor assumes the position that no connection is required because Rule 3018(b) specifies the count of "the holder of record" in a pre-bankruptcy context.

### B. *Securities Practices: The Record Holder*

Publicly held securities that are traded in securities markets circulate among brokers, dealers, banks, and other financial institutions that trade in securities on a regular and continuing basis. Securities clearing houses serve as agents to facilitate the transfer of securities for the accounts of their institutional participants; when the securities are traded by and among those participants, the transfers are handled as book entries, eliminating the need for cancelling and reissuing the certificates representing the securities themselves.

Securities held of record by a clearing house may actually be owned by a participant institution for its own account. In other cases, some or all of a participant's interests in those securities may be held for the account of customers of the participant. The person or entity ultimately entitled to the benefits of ownership of the security, whether the participant or a participant's customer, is known as the "beneficial owner" of the security. The broker acts as agent for its customers, and according to the testimony presented at trial, is required to vote and indeed, purportedly votes pursuant to the instructions of its customers.[21]

This practice facilitates quick and easy trading and eliminates the necessity of physical transmission of paper which would slow trading and marketability of securities. However, a clear distinction may be drawn between the acceptance of a tender offer or proxy solicitation (guided by securities laws), and the vote on a plan of reorganization (guided by the Code).

At the very heart of this matter is the necessity for the demonstration of a nexus between the record holders *vote* and the *authority* of the record holder to vote on the Plan. In this case, no attempt was made to establish authority of record holders to vote on the Plan. Record holders may have been considered to have authority to authorize a tender or exchange, but vote on a plan of reorganization is not a tender or exchange.

The testimony indicates that security industry practice in a tender or exchange offer is rather relaxed; the broker usually contacts the beneficial holder by telephone and discusses the economic ramifications of the offer. A witness for the Debtor, expert in the securities industry,[22] evaluated all three of the offers, and stressed the fact that the "pre-packaged" plan contains the same economic deal which was presented with the July and August solicitations. This witness demonstrated no familiarity with the terms of the Plan—in fact, he testified with jocularity that he had not read the October 5 Solicitation "from cover to cover" and that such scrutiny of solicitation materials is not industry practice. In light of the testimony, the Court finds it doubtful that record holders transmitted the October 5 Solicitation materials to a substantial number of beneficial holders in this case.[23] The Court has serious doubts as to whether those who voted, or instructed a vote, had a reasonable opportunity to

---

21. Except in the case of holders holding accounts on a purely discretionary basis.

22. The Debtor's witness who offered testimony about the reasonableness of the time allowed for the bondholder evaluation of the Plan trades in Southland securities, was a member of the Steering Committee and is currently a member of the Official Bondholders Committee.

23. The Court notes for the record that the record date for the October 5 Solicitation was October 5, 1990. Thus, it is likely that at least some holders were receiving disclosure materials for the first time and all holders were receiving disclosure about the plan for the first time.

evaluate the non-economic and legal ramifications of the confirmation of the Plan.

### C. *The Questionable Tabulation of the Votes*

Following the dissemination of the solicitation materials, Hill & Knowlton, the Debtor's information agent, passed the baton to Bankers Trust, the Depository Agent which was retained by the Debtor to tabulate the votes. Ballots for voting on the Plan were contained only with the October Solicitation and were to be cast by record holders who were to deliver the ballots to Bankers Trust for final delivery to the Debtor. These steps were to be completed in fourteen to sixteen calendar days (ten to eleven business days) from the date the solicitation materials left the hands of the Debtor's agents.

Extended ballots were to be delivered to Bankers Trust by 5:00 P.M. October 23, 1990. Votes were accepted by mail, hand delivery, and for eligible banks, via facsimile. For defective ballots, Bankers Trust representatives contacted the record holders by telephone to remedy the problem by the voting bar date. At trial, the Court admitted eight boxes into evidence which contained ballots pertaining to the five tranches of bond debt and preferred share class.[24]

The tabulation of those votes included a series of complicated acts. The Bankers Trust representative testified that Southland solicitations were neither complicated nor extraordinary. However, the volume and description of the matters dealt with in the fourteen days allowed for voting belies this assertion. Aside from the obvious difficulties of the physical transmission, none of the participants in the counting of the votes were versed in bankruptcy voting requirements, but instead were experts in their respective capacities in proxy solicitations, and exchange and tender offers.

The representative followed securities practices.

### D. *The Ballot*

Apparent confusion occurred in the voting process. Brokers and participants[25] frequently failed to appropriately mark ballots as required. Perhaps the shortened time frame created the confusion and complexity of the matter, or perhaps confusion may be attributed to the ballot, printed on both sides, aptly described at various hearings as a "table cloth", which measures approximately $16'' \times 33''$. The balloting instructions were lengthy and complicated in order to facilitate (1) votes on the Plan by six different classes of voters; (2) votes on the Plan holders who had previously tendered their bonds; (3) votes and tenders by holders who had not previously tendered and wished to vote and tender their 3 bonds; and (4) tender only for holders who declined to vote and wished only to tender. The tabulation of such a solicitation can hardly be said to be facile. Even more importantly, the *tabulators* made value judgments about each ballot, and determined whether they would and how certain ballots would be counted. At trial the tabulator testified that some ballots were not counted, and boxes containing such ballots were left in New York in the offices of Banker's Trust.

#### 1. One Yes, One No

■ Record holders vote and act in a representative capacity. In this capacity, each record holder votes for numerous beneficial holders. In this case, to count the representative vote, the tabulator gave each record holder one vote. This "one vote" created some problems when the record holder voted "yes" and "no".[26] No logical relationship was given to the actual vote or proportion of votes of the bondholders. The Debtor contends that this method

---

**24.** The eight boxes did not contain all of the ballots cast and received by Bankers Trust, see p. 223 *infra.*

**25.** Such brokers and participants are allegedly expert in the field and familiar with the tender offer process.

**26.** e.g., If a record holder with $38,000,000 on the record date, cast $27,000,000 as "yes" and $11,000,000 as "no" for the Plan the Debtor counted this vote: "1–yes"; "1–no."

of counting is in compliance with Bankruptcy Rule 3018, and reflects the vote of the record holders. This Court concludes that this method of counting is not reliable and not in accord with 11 U.S.C. § 1126.

### 2. The Overvote and the Discounted Vote

The dollar value voted is based upon the amount held by each record holder on the record date.[27] Again, the discretion of counting the votes was left to the tabulator who determined whether the record holder had cast an "overvote" (a ballot representing a vote of a dollar amount in excess of the record amount.) In the event of an overvote, the tabulator prorated the dollar amounts.

Similarly, record holders who cast votes at different times were also subject to the tabulators evaluation. If a record holder sent in two separate ballots on two different days, the later dated ballot controlled the vote and negated the first vote. It is probable that a second vote could create an overvote. The treatment of later cast vote with an overvote is unclear from this record. On these facts, without a reference to the *true owners*, a *true* vote is impossible to determine.

In any case, the evidence demonstrates a continued *evaluation and judgment of the ballots by the tabulators* in connection with the rejection or acceptance of a ballot as a valid vote. For example, the tabulators counted a letter of transmittal with a blank ballot as a "yes" vote. A letter of transmittal returned *sans* ballot was also determined by the tabulators to be an acceptance.

### III. PREPETITION VOTING

The starting point for consideration of a pre-filing acceptance of a plan involves 11 U.S.C. § 1126, which provides:

(a) The holder of a claim or interest allowed under § 502 of this title [11 USC § 502] may accept or reject a plan ...

(b) For the purposes of subsections (c) and (d) of this section, a holder of a claim or interest that has accepted or rejected the plan before the commencement of the case under this title is deemed to have accepted or rejected such plan, as the case may be, if—(1) the solicitation of such acceptance or rejection was in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or (2) if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in § 1125(a) of this title [11 USC § 1125(a)].

(c) A class of claims has accepted a plan if such plan has been accepted by creditors, ... that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors....

(d) A class of interests has accepted a plan if such plan has been accepted by holders of such interests, ... that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, ...

The statute mentions only "holders of claims", "claims", "interests", and "creditors". There is no mention of "record holders". Prior to the filing of the case, "holders of claims", or "creditors", or "interests", are deemed to have accepted or rejected the plan if (1) the solicitation thereof was in compliance "with *'any'* applicable nonbankruptcy law, rule, or regulation governing adequacy of disclosure in connection with such solicitation, or (2) if no *such* law, rule, or regulation exists the solicitation was after disclosure to such holder of adequate information as defined in § 1125(a) [of the Code]." 11 U.S.C. § 1126(b)(2) (emphasis added.)

■ The next focus of our attention is Bankruptcy Rule 3018:

(a) PERSONS ENTITLED TO ACCEPT OR REJECT PLAN; TIME FOR ACCEPTANCE OR REJECTION. A plan may be accepted or rejected by the following entities within the time fixed by the court pursuant to Rule 3017; (1)

---

27. The record date is October 5, 1991 (October Solicitation).

any creditor whose claim is deemed allowed pursuant to § 502 of the Code or has been allowed by the court; (2) subject to subdivision (b) of this rule, any *creditor* who is a *security holder of record* at the date the order approving the disclosure statement is entered whose claim has not been disallowed; and, (3) an equity security holder of record at the date the order approving the disclosure statement is entered whose interest has not been disallowed . . .

(b) ACCEPTANCES OR REJECTIONS OBTAINED BEFORE PETITION. Acceptances or rejections of a plan may be obtained before the commencement of a case under the Code and may be filed with the court on behalf of (1) *the holder of a claim or interest* which is deemed allowed pursuant to § 502 of the Code or allowed by the court; (2) a *creditor* who is a *security holder of record* at the date specified in the solicitation for the purposes of such solicitation and whose claim has not been disallowed; and (3) an *equity security holder of record* at the date specified in the solicitation for the purposes of such solicitation and whose interest has not been disallowed. A holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Code shall not be deemed to have accepted or rejected the plan if the court finds after notice and hearing that the plan was not transmitted to substantially all impaired creditors and impaired equity security holders, that an unreasonably short time was prescribed for such creditors and equity security holders to accept or reject the plan, or that the solicitation was not in compliance with § 1126(b) of the Code . . .

(emphasis added.)

When interpreting a statute the Court is guided by the Supreme Court's statement that "[t]he plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" *U.S. v. Ron Pair Enterprises*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)).

In looking at the plain meaning of the words of § 1126(b), the only descriptive words utilized to describe those who may accept or reject a plan are "holders of claims", "creditors", and "holders of interests". There is no reference to "record holders".

Bankruptcy Rule 3018(a), in describing entities who may accept or reject a plan, utilizes the words *"any creditor"* [28]; any *"creditor* who is a *security holder of record"* [29]; and *"equity security holder of record"*.[30] Subsection (b) of the Rule utilizes as descriptive words to describe entities who may accept or reject a plan *prepetition*: *"holder of a claim or interest"* [31]; *"a creditor* who is a *security holder of record"* [32]; and *"an equity security holder of record"* [33]. Later, subsection (b) of Rule 3018 utilizes the words, "A '*holder of a claim or interest*' who has accepted or rejected a plan before the commencement of a case under the Code shall not be deemed to have accepted or rejected the plan ... if the Court finds ... that an unreasonably short time was prescribed for such '*creditors*' and '*equity security holders*' to accept or reject the plan....'" The Statute and the Rule affect creditors and holders of interests, and therefore only those votes are to be deemed acceptances or rejections.

Southland and the Committee argue that the record holder is the relevant party to accept or reject a plan prepetition under

28. Federal Rule of Bankruptcy Procedure 3018(a)(1).

29. *Id.* 3018(a)(2).

30. *Id.* 3018(a)(3).

31. *Id.* 3018(b)(1).

32. *Id.* 3018(b)(2).

33. *Id.* at 3018(b)(3).

state corporate law, state and federal securities law, and for practical consideration.[34] They cite Act Cases for the proposition that when a beneficial owner leaves a security in the hands of a broker he or she impliedly authorizes the broker to vote said security.[35] They also cite Bankruptcy Rule 3003(d) for the proposition that the beneficial owner *may* apply to the Court to be treated as a record holder for the purpose of Bankruptcy Rule 3018.

The first issue is whether or not a record holder of a publicly traded debt security is the holder of a claim, or a creditor, for the purpose of accepting or rejecting a plan.[36] Secondly, if the record owner is not the holder of a claim, which party may vote, and how should that vote be cast within the purview of the Bankruptcy Code and Bankruptcy Rules?

In the case at hand, the record holder of a bond or bonds, may or may not be the holder of the claim based upon the debt represented by those bonds. If that record holder is the true owner then it would follow that owner is the holder of the claim and entitled to accept or reject the plan; if the record holder is a broker or participant, he or it would be acting as an agent or bailee for the true owner (called "beneficial owner"). The Southland bankruptcy involves various classes of bond debt, as well as preferred stock, which are impaired by the plan. The holder of a claim would vote acceptance or rejection based upon his amount of debt represented by bonds *per class* thereof; the preferred shareholder would vote his interest as a number of shares. This conclusion is based upon the definition of a claim and an interest. 11 U.S.C. §§ 101(5) and (10).

The prepetition negotiation and solicitation of acceptances of a plan is an admirable process. It saves time and expense and the various problems of an ongoing Chapter 11 proceeding. However, the pre-filing process outlined in § 1126 of the Code, presents a very formidable and imposing mountain for the proponent of a pre-filing plan to climb.

■ Section 1126(b) authorizes the deeming of acceptances of a pre-filing plan if on the one hand the solicitation of acceptance or rejection is in compliance with "any applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure." What applicable nonbankruptcy law, rule or regulation does this involve? Does this requirement encompass all federal securities laws and regulations? Does this requirement encompass the securities laws of the 50 states? Does this requirement encompass the corporation law of the 50 states? Does this requirement involve the rules or regulations of the stock exchanges? Does this requirement comprise the rules and regulations of the NASD as to brokers? It appears that the proponent of such a pre-filing plan has the burden of proof upon the confirmation hearing in the bankruptcy case to prove compliance with all, or any, of the wide-ranging laws and rules pertaining to disclosure in order to gain the deeming of acceptances. Or, on the remote possibility that no such law, rule or regulation applies, the proponent may elect the alternative proof under § 1126(b)(2): that if there is not any such law, rule or regulation that the acceptance or rejection was solicited after disclosure, defined in § 1125(a) of the Code. This approach would require a showing by the proponent of a pre-filing plan at a confirmation hearing that (a) no nonbankruptcy law, rule or regulation applies, and therefore, (b) the disclosure materials complied with the bankruptcy requirements as to a disclosure statement under § 1125 of the Code. Any shortcoming therein would require going back to the drawing board for a bankruptcy regulated disclosure statement hearing with notice, and the usual bankruptcy process toward a hearing on confirmation. These two provisions of § 1126(b) amount to a form of "Russian

---

34. The Committee Brief discusses SEC rules providing for the transmission of proxy materials to record holders to be *forwarded to beneficial owners.*

35. *In re: Pressed Steel Car Company,* 16 F.Supp. 329 (W.D.Pa.1936).

36. 11 U.S.C. § 1126.

Roulette" for the proponent of a pre-filing plan.

Rule 3018 comes into play as a procedural mechanism whereby "the holder of a claim or interest who has accepted or rejected a plan before commencement of a case *shall not* be *deemed* to have accepted or rejected the plan if the Court finds after notice and hearing that the plan was not transmitted to substantially all impaired creditors and impaired equity security holders, that an unreasonably short time was prescribed for such creditors and equity security holders to accept or reject the plan, or that the solicitation was not in compliance with § 1126(b) of the Code." The *Statute* (§ 1126(b)) refers to *"deeming acceptances if ..."*; the *Rule* provides that acceptances "shall *not* be deemed if...." The statute therefore says one deems acceptances if certain compliances occurred; while the Rule says that acceptances shall not be deemed if the Court finds insufficient disclosure, circulation, or time for voting.

Rule 3018 offers little guidance regarding the rationale for the wording of that rule.[37] It appears that the Bankruptcy Rules Committee attempted to adapt the voting requirements for acceptance or rejection to publicly held corporations.

Congress authorized the Supreme Court to prescribe Rules of Practice and Proce-

dure under Title 11.[38] That statute provides that: "The Supreme Court shall have the power to prescribe by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure in cases under Title 11." The statute further provides that "[s]uch rules shall not abridge, enlarge, or modify any substantive right." [39]

This Court finds that the references in Bankruptcy Rule 3018 to "holders of record" are substantive changes in the Statute.[40]

There is little existing case law as to the authorization of a representative to act on behalf of creditors or shareholders. The Court finds two references to the qualifications of a representative party in voting to accept or reject the plan on behalf of another person or entity. Bankruptcy Rule 2019 requires the filing by every entity representing more than one creditor or equity security holder of a verified statement with the Court setting forth specific facts concerning the representation, and the *names* of the parties represented.

Bankruptcy Rule 9010(c) provides that "the authority of any agent, attorney-in-fact, or proxy to represent a creditor for any purpose *other than* the execution and filing of a proof of claim, or the *acceptance* or *rejection* of a plan, shall be evidenced by a power of attorney." Neither the Stat-

---

**37.** "Subdivision (b) recognizes the former Chapter XI practice permitting a plan and acceptances to be filed with the petition, as does § 1126(b) of the Code. However, because a plan under Chapter 11 may affect shareholder interests, there should be reference to a record date of ownership. In this instance the appropriate record date is that used in the prepetition solicitation materials because it is those acceptances or rejections which are being submitted to the court." Advisory Committee Note (1983).

Editors' Comment: (b) Pursuant to paragraph (b), if a prepetition acceptance or rejection of a party who is a security holder or is an equity security holder is to be filed, or is filed, with the court, the commentary under paragraph (a) should be consulted. In such case the date in paragraph (a) for determination of the holder of record is inapplicable, and paragraph (b) substitutes "the date specified in the solicitation for the purposes of such solicitation."
The editors' comment for (a) states: ... those who may vote for or against a plan (or plans)

are placed into three classifications ... [including] any creditor who is a security holder of record (at the date of entry of approval of the disclosure statement) and whose claim has not been disallowed.... [A] creditor is defined in Code § 101(9), generally, as an entity which has a prepetition claim ...; while "claim" is generally defined by Code § 101(4) as a right to payment. The term "security" in [sic] defined in Code § 101(43) and includes such evidences of debt or a right to payment as a note, bond, debenture, and certificate of deposit. Thus, this class is made up of creditors who hold documents, as reflected on the appropriate record of the holders of such documents at the time of entry of the order approving the disclosure statement.

**38.** 28 U.S.C. § 2075 (U.S.C.A.1978).

**39.** *Id.*

**40.** 11 U.S.C. 1126(b).

ute nor the Rules provide guidance as to the showing of authority of a party voting on behalf of another party to accept or reject a plan. In the case before the Court, it will be required that there be placed on every ballot, a provision for the certification by the party casting the ballot to accept or reject the plan, that, said party has the *authority* to represent another entity or party, with the name of the party represented, and further, that the person voting has been authorized to cast that ballot accepting or rejecting the Plan.

■ In this case, the solicitation materials were dated October 5, 1990, and by the testimony of a witness, were not mailed to the creditors and preferred shareholders until the 9th or 10th of October, 1990. The expiration date for acceptance or rejection was October 22, 1990. The Court finds that there were only eight (8) business days allowed for the transmission of the materials by brokers to their customers (beneficial owners) and for the original receipt, analysis and vote by the actual owners of the claims or stock. The time was extended to October 23, 1990, but that date was not in the original mailing and materials. The Court finds that an unreasonably short time was prescribed for the votes to accept or reject. For that reason the acceptances and rejections will not be deemed accepted nor counted as to the Plan. It is not necessary to go to the issues of disclosure, for there will have to be a new vote based on an appropriate time period for notice and voting. Prepetition environment aside, when a case is filed as a bankruptcy proceeding, Bankruptcy law and rules govern.

## CONCLUSION

■ 1. Taking the plain words of Congress in § 1126, only the holder of a claim, or a creditor, or the holder of an interest, may accept or reject a plan. If the record holder of a debt is not the owner of a claim, or a true creditor, he may not vote validly to accept or reject, unless he is an authorized agent of the creditor, and this authority is established under appropriate Bankruptcy law and rules. In this case the votes were not those of holders of claims.

2. The references to record holders in Bankruptcy Rule 3018, are attempted, substantive changes, and of no effect.

3. The time allowed for voting in this case was unreasonably short; the votes are not to be *deemed* acceptances, and all votes are invalidated.

■ 4. There is to be a hearing on disclosure materials and a further vote of all creditors and preferred shareholders on the Plan; if votes by agent brokers or representatives are to be cast, there must be a disclosure of the name of the true holder of the claim or interest, and a certification of authority to vote as representative thereof. Where an entity represents more than one creditor or interest owner, there must be compliance with Bankruptcy Rule 2019(a) with a list of claimants or owners on behalf of whom votes are being cast. The determinative date as to ownership of claims and interests is December 13, 1990, the date next prior to hearing on confirmation set December 14, 1990.

APPENDIX A

SOUTHLAND CORP
BALLOT TABULATION

NOVEMBER 21, 1990
FINAL REPORT

### SOUTHLAND CORP 13 1/8%

| | * NO OF HOLDERS | PER OF HLDRS VTD | PRINCIPAL AMOUNT | PER OF P.A VOTED |
|---|---|---|---|---|
| YES | 83 | 87.37% | $260,563,552.00 | 97.97% |
| NO | 12 | 12.63% | $5,390,542.00 | 2.03% |
| TOTAL | 95 | 100.00% | $265,954,094.00 | 100.00% |
| ABSTAIN | 12 | | $4,804,181.00 | |

### SOUTHLAND CORP 16 3/4%

| | * NO OF HOLDERS | PER OF HLDRS VTD | PRINCIPAL AMOUNT | PER OF P.A VOTED |
|---|---|---|---|---|
| YES | 112 | 70.00% | $247,679,000.00 | 96.07% |
| NO | 48 | 30.00% | $10,142,000.00 | 3.93% |
| TOTAL | 160 | 100.00% | $257,821,000.00 | 100.00% |
| ABSTAIN | 8 | | $5,869,000.00 | |

### SOUTHLAND CORP 16 1/2%

| | * NO OF HOLDERS | PER OF HLDRS VTD | PRINCIPAL AMOUNT | PER OF P.A VOTED |
|---|---|---|---|---|
| YES | 35 | 81.40% | $264,923,000.00 | 99.07% |
| NO | 8 | 18.60% | $2,500,000.00 | 0.93% |
| TOTAL | 43 | 100.00% | $267,423,000.00 | 100.00% |
| ABSTAIN | 1 | | $2,000,000.00 | |

### SOUTHLAND CORP 16 1/4%

| | * NO OF HOLDERS | PER OF HLDRS VTD | PRINCIPAL AMOUNT | PER OF P.A VOTED |
|---|---|---|---|---|
| YES | 123 | 80.92% | $269,381,000.00 | 82.34% |
| NO | 29 | 19.08% | $57,761,000.00 | 17.66% |
| TOTAL | 152 | 100.00% | $327,142,000.00 | 100.00% |
| ABSTAIN | 10 | | $1,663,000.00 | |

### SOUTHLAND CORP 18%

| | * NO OF HOLDERS | PER OF HLDRS VTD | PRINCIPAL AMOUNT | PER OF P.A VOTED |
|---|---|---|---|---|
| YES | 70 | 80.46% | $26,872,000.00 | 91.31% |
| NO | 17 | 19.54% | $2,557,000.00 | 8.69% |
| TOTAL | 87 | 100.00% | $29,429,000.00 | 100.00% |
| ABSTAIN | 9 | | $471,000.00 | |

### SOUTHLAND CORP 15% CUM. PFD

| | NO OF HOLDER | PER OF HLDRS VTD | SHARES | PER OF SHS VOTED |
|---|---|---|---|---|
| YES | 683 | 98.99% | 8,132,253 | 99.95% |
| NO | 7 | 1.01% | 3,995 | 0.05% |
| TOTAL | 690 | 100.00% | 8,136,248.00 | 100.00% |
| ABSTAIN | 27 | | 141,083 | |