**In re CITY OF COLORADO SPRINGS SPRING CREEK GENERAL IMPROVEMENT DISTRICT, Debtor.**

**Bankruptcy No. 94–15333 MSK.**

United States Bankruptcy Court, D. Colorado.

Jan. 31, 1995.

Patricia K. Kelly, Office of City Atty., Colorado Springs, CO, James B. Holden, Holden & Jessop, P.C., Denver, CO, for debtor.

Barbara K. Tenney, Ankele, Icenogle, Norton and White, P.C., Denver, CO, for Property Owners Rosenbaum/Dean.

James S. Bailey, Jr., Bailey, Harring & Peterson, P.C., Denver, CO, for Colorado Bondshares.

Virginia Anne Housum, Dorsey & Whitney, Denver, CO, for Indenture Trustee, Colorado Nat. Bank.

## MEMORANDUM OPINION AND ORDER DENYING CONFIRMATION OF PLAN

MARCIA S. KRIEGER, Bankruptcy Judge.

THIS MATTER came on for hearing for determination of the adequacy of the Disclosure Statement for the Plan for Adjustment of Debts dated April 20, 1994 ("Disclosure Statement") and confirmation of the Amended Plan for Adjustment of Debts dated September 6, 1994 (the "Amended Plan") filed by the City of Colorado Springs Spring Creek Improvement District (the "District").

This bankruptcy was filed as a prepackaged Chapter 9 case. A single hearing was set to consider the District's request for the entry of an Order for Relief, approval of the District's prepetition disclosure and solicitation, and confirmation of a proposed plan. Notice of the bankruptcy filing and the combined Disclosure Statement and confirmation hearing was given pursuant to 11 U.S.C. § 923 and Fed.R.Bankr.P. 2002. Colorado Bondshares (the "Objector") objected to entry of the Order for Relief and confirmation of the proposed plan. In partial response to the objection, the District filed the Amended Plan two days prior to the scheduled hearing.

At the originally scheduled hearing, the Court determined that the District was eligible to be a Chapter 9 debtor and entered an Order for Relief. Because the District had not given prior notice of the Amended Plan to its bondholders nor obtained written acceptances of the modifications pursuant to Fed.R.Bankr.P. 3019, the hearing was continued as to the remaining issues.

Having reviewed and considered the evidence submitted at the final hearing, the briefs and the arguments of counsel, I conclude that the Amended Plan is not confirmable because it does not comply with 11 U.S.C. §§ 943(b)(1), (6) and (7). On October 24, 1994, I issued an oral ruling with regard to these matters, but at the request of the parties, I am issuing this written memoran-

dum and opinion. To the extent of any inconsistency between the oral ruling and this written opinion, the written opinion shall govern.

## I. FACTUAL FINDINGS

### A. The District Bonds

The District is a general improvement district organized in 1985 pursuant to Colorado law, specifically C.R.S. § 31–25–601, *et seq.* The District is comprised of approximately 454 acres of partially developed land located in Colorado Springs, Colorado. In 1987, in order to fund improvements associated with development, the District issued a series of general obligation bonds (the "Bonds") in the principal amount of $5,355,000. The Bonds have maturity dates ranging from 1994 through 2006.

When the Bonds were issued, the District entered into a trust agreement (the "Trust Agreement") with Colorado National Bank Exchange, as Trustee. Under the Trust Agreement, the District conveyed all of its interests and rights under a certain letter of credit (the "Letter of Credit") to the Trustee. The Letter of Credit was posted as collateral for payment of the Bonds' principal and interest as they came due. Under the terms of the Trust Agreement, if District property taxes are inadequate to pay the principal and interest on the Bonds, the Trustee is entitled to draw against the Letter of Credit to make timely principal and interest payments. The Trustee has drawn on the Letter of Credit numerous times. The remaining amount, against which the Trustee may draw, is $416,232.

In late 1993, the District anticipated that the remaining proceeds to be drawn under the Letter of Credit would be exhausted and the real estate tax assessments would be necessarily and substantially increased in order to pay its Bond obligations. As a consequence, the District began negotiations with property owners and some bondholders to restructure the bond indebtedness. The negotiations generated a proposed plan of adjustment, which was acceptable to some, but not all, bondholders.

### B. The District's Efforts at Reorganization

The District solicited acceptances of its proposed plan between April 21 and May 26, 1994. Those voting on the plan were advised that after solicitation the District intended to file a Chapter 9 petition in bankruptcy. The District conducted the prepetition solicitation by mailing the proposed plan, the Disclosure Statement and a ballot to beneficial bondholders known to it. For bondholders not known to the District, materials were mailed either directly to investment firms holding Bonds in street name or to ADP Proxy Services as the agent for six investment firms which held Bonds in street name.

The proposed plan created two classes of claimants. Class 1 included all bondholders. Class 1 claimants were to be paid at different times and from different sources. Class 2 included all allowed administrative expense claims. The Amended Plan retains the two original classes, but subdivides Class 1 into subclasses 1–A, 1–B and 1–C.

Class 1–A consists of claimants holding Bonds which mature in 1994, 1995 and 1996 in the total principal amount of $440,000. Class 1–A claimants are to be paid in full on December 1, 1994 using the remaining Letter of Credit proceeds. Such payment is premature as to the Bonds which mature in 1995 and 1996.

Class 1–B is comprised of claimants holding Bonds which mature in 1997. The total principal amount of these Bonds is $230,000. Class 1–C is comprised of claimants holding Bonds in the total principal amount of $4,420,000 which mature in the year 2006. Class 1–B and 1–C claimants are to be paid by the issuance of new plan bonds. A small portion of the plan bonds will be structured as serial bonds which come due in 1998 through 2014. The remainder, with an aggregate principal balance of $3,490,000, will be structured as a single term bond issue with a maturity date of December 1, 2033.

Class 2 is comprised of administrative expense claims allowed pursuant to 11 U.S.C. § 503. These claims are to be paid in cash on the effective date of the Amended Plan or

according to independent agreements with Class 2 claimants.

Although the original solicitation was premised on one voting class of bondholders, the District has submitted an amended vote summary ("Vote Summary") which categorizes the votes according to the Amended Plan's subclasses. According to the Vote Summary, 28 votes were cast for and one vote cast against the Amended Plan. No votes were received from beneficial holders of Bonds held in street name by four investment firms. The non-voting beneficial holders are Class 1–A and 1–B claimants.

Ninety-seven percent in amount, or $4,935,000 out of $5,090,000 of outstanding Bonds, cast votes in this election. Eighty percent in amount or $3,935,000 out of $4,935,000 voted in favor of the Amended Plan.[1] All classes initially accepted the proposed plan. None of the original votes were changed in light of the Amended Plan.

### C. The Objection

The Objector raises five arguments in opposition to confirmation:

1. The Amended Plan cannot be confirmed pursuant 11 U.S.C. § 943 because Colorado law requires an election in order for the District to issue plan bonds to Class 1–B and 1–C claimants, no election has been held and the Amended Plan is not contingent upon an election;

2. The Amended Plan cannot be confirmed because the District improperly uses the Letter of Credit to pay only Class 1–A claimants;

3. The Amended Plan impermissibly classifies and discriminatorily treats bondholders in Classes 1–B and 1–C;

4. The Disclosure Statement is inadequate because it does not contain an analysis of the issues raised by the Objector; and

5. The acceptances of Bondholders William R. Huff & Company and its transferees should be designated.

In the following analysis I address the Objector's first, second and fourth arguments. Based upon my analysis of the issues related to these arguments, it is unnecessary to address the Objector's remaining arguments.

### II. ANALYSIS

To be confirmed, a plan of adjustment must satisfy the requirements of 11 U.S.C. § 943(b).[2] For the following reasons, I conclude that 11 U.S.C. §§ 943(b)(1), (6) and (7) are not satisfied and therefore I decline to confirm the Amended Plan.

### A. Section 943(b)(1)

Section 943(b)(1) provides that the plan must comply with the provisions of Title 11 made applicable by 11 U.S.C. §§ 103(e) and 901. Section 901 incorporates certain provisions of Chapter 11. Of importance here are §§ 1129(a)(2), 1126 and 1125.

Section 1129(a)(2) generally requires the proponent of a plan to comply with applicable provisions of Title 11 in order to have its plan confirmed. These include § 1126 which governs acceptance of a plan and § 1125 which sets out the requirements for disclosure statements.

---

**1.** Six Class 1–A and two Class 1–B claimants voted in favor of the Amended Plan. No votes were cast against the Amended Plan by either of these subclasses; however, there were claimants in each subclass who did not vote. Thus, 100 percent in amount or $310,000 out of $310,000 Class 1–A claimants and 100 percent in amount or $205,000 out of $205,000 Class 1–B claimants voted in favor of the Amended Plan. In Class 1–C, 22 votes were cast in favor of the Amended Plan and one vote was cast against the Amended Plan. Seventy-seven percent in amount or $3,420,000 out of $4,420,000 of Class 1–C voted in favor of the Amended Plan.

**2.** Section 943(b) requires the Court to confirm the plan when the seven specified requirements are satisfied. Its language is different than the language found in 11 U.S.C. § 1129(b) which says that "the Court shall confirm a plan *only* if all of the ... requirements are met" (emphasis added). The language of § 943(b) leaves open the possibility that if all of the requirements are not met the Court could confirm a Chapter 9 plan. Such issue was not raised by the parties, however.

### 1. Adequacy of the Disclosure Statement

The District's original plan was solicited prior to the filing of this Chapter 9 case. Prepetition solicitation is authorized by 11 U.S.C. § 1126(b) which provides:

(b) For the purposes of ... this section, a holder of a claim or interest that has accepted or rejected the plan before the commencement of the case under this title is deemed to have accepted or rejected such plan, as the case may be, if—

(1) the solicitation of such acceptance or rejection was in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of the disclosure in connection with such solicitation; or

(2) if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information as defined in section 1125(a) of this title.

Pursuant to 11 U.S.C. § 1126(b), disclosure statements either must satisfy applicable nonbankruptcy law, rules or regulations or the provisions of § 1125. The District contends that its prepetition solicitation satisfies the provisions of both prongs of 11 U.S.C. § 1126(b), namely that the Disclosure Statement is subject to and in compliance with federal and state securities laws and that the Disclosure Statement contains adequate information pursuant to 11 U.S.C. § 1125(a).

■ The Objector argues that the Disclosure Statement is inadequate pursuant to § 1126(b) because (1) it does not contain a discussion of whether the District could utilize the Letter of Credit proceeds for payment of Class 1–A creditors; and (2) it does not address the necessity of an election under Colorado law in order to restructure the District's bond indebtedness. The District responds that it is not required to disclose or address legal arguments raised by the Objector which are not facts upon which the bondholders might evaluate a plan.

I am not persuaded by the Objector's argument that the Disclosure Statement is inadequate because it does not analyze the Objector's objections. Such objections are legal in nature and while information addressing them might interest lawyers, it is not likely of interest or benefit to the bondholders whose solicitation was sought. Nonetheless, the Disclosure Statement is inadequate because it does not satisfy either of the requirements of § 1126(b).

■ First, the Disclosure Statement is inadequate under federal and state securities laws as required by 11 U.S.C. § 1126(b)(1). Ronald Lehmann, the District's bond counsel, testified that he had reviewed the Disclosure Statement and that it was subject to applicable federal and state securities laws. Lehmann was not offered as an expert in securities law, but even had he been so offered and accepted, he identified two deficiencies in the Disclosure Statement under federal and/or state securities laws. The Disclosure Statement failed to identify and quantify the administrative expenses and failed to discuss the possibility and effect of any decrease in property valuation upon the District's performance and the Amended Plan.

Second, these two deficiencies are also deficiencies pursuant to 11 U.S.C. § 1125(a). Section 1125(a) requires information of a kind and in sufficient detail, as far as reasonably practicable, in light of the nature and the history of the debtor, and the condition of the debtor's books and records to enable a hypothetical reasonable investor, typical of the holders of the claims or interests of the relevant class, to make an informed judgment about the plan.

[T]he purpose of a disclosure statement is to inform equity holders and claimants, as fully as possible, about the probable financial results of acceptance or rejection of a particular plan.... [T]he information to be provided should be comprised of all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan.

*In re Stanley Hotel, Inc.,* 13 B.R. 926, 929 (Bankr.D.Colo.1981).

The Disclosure Statement contains no identification of, or estimation of, the amount of Class 2 administrative expenses. If the District cannot pay its administrative expenses on the effective date or according to

other agreed upon terms, the Amended Plan cannot be confirmed. 11 U.S.C. § 943(b)(5). If the District is unable to pay administrative expenses on the effective date, it must structure payments over time. Under the terms of the Amended Plan, all future revenue is allocated to payment of Class 1–B and 1–C claimants. Thus, it is important that creditors be advised of the estimated amount of administrative expenses to determine whether the District can pay the administrative expenses without dipping into future revenue.

More importantly, the Disclosure Statement fails to disclose the potential impact of any decrease in the assessed value of the property in the District. The espoused purpose of the Amended Plan is to avoid substantial increases in taxes assessed against the real property in the District in order to repay Bonds. The mill levy for taxes varies inversely to the assessed value of the property. Thus, when assessed property values increase, the mill levy decreases, similarly, if assessed property value decreases, the mill levy increases.

The Chapter 9 filing was caused by the District's fear that it could not honor its Bond obligations without substantially increasing the mill levy. If property taxes were raised to the level necessary to pay the Bonds, the District feared that property owners would sell or abandon their property, or the District would be required to foreclose its tax liens. If numerous foreclosures occurred, the District feared that the remaining tax base would shrink causing property tax assessments against parcels to increase again and again. The District characterizes this phenomenon as a "death spiral." The Amended Plan attempts to stabilize taxes by restructuring the Bonds and repaying them over a longer period of time. It is premised upon the presumption that there will be no increase in the mill levy because property values will remain constant or increase.

The District attached several charts to the Disclosure Statement to demonstrate the feasibility of future payments. All of the charts reflect the assumption that property values will either remain constant or increase. The Disclosure Statement does not address the possibility or effect of a decrease in the assessed value of the real property, due to any of a multitude of possible causes. According to the Disclosure Statement, property values have decreased in each of the last three years due to factors unrelated to the Bonds, therefore to adequately inform bondholders, the Disclosure Statement must assess the possibility and effect of any foreseeable decrease in the assessed value of the property in the District upon the District's ability to perform under the Amended Plan.

### 2. Adequacy of the Prepetition Solicitation

■ I also conclude that the prepetition solicitation process was inadequate because it failed to provide all creditors and interested parties with due process.

An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action, and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance.

*Mullane v. Central Hanover Bank & Trust Company,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) (citations omitted). In a bankruptcy context, a creditor is entitled to adequate notice before the creditor's claim is barred or its rights are changed by operation of law. *City of New York v. New York and New Hampshire Railroad Co.,* 344 U.S. 293, 297, 73 S.Ct. 299, 301, 97 L.Ed. 333 (1953).

■ A confirmed Chapter 9 plan changes the rights of creditors. Section 944(a) specifically provides that a confirmed plan bind the debtor and any creditor whether or not proof of the creditor's claim is filed, the claim is allowed or the creditor has accepted the plan. Thus, as in Chapter 11 cases, creditors and interested parties must be properly notified of all vital steps in the reorganization and confirmation process so that they have the opportunity to protect their interests. *Reli-*

*able Electric Co. v. Olson Construction Co.,* 726 F.2d 620, 623 (10th Cir.1984); *See also Ault v. Emblem Corp. (In re Wolf Creek Valley Metropolitan District No. IV),* 138 B.R. 610 (D.Colo.1992) (the Court analyzes the due process notice requirements in a Chapter 9 case).

Ordinarily in both Chapter 11 and Chapter 9 cases, proponents of a plan seek approval of the proposed Disclosure Statement and the plan solicitation process prior to solicitation. Fed.R.Bankr.P. 3017. In a Chapter 11 case, the U.S. Trustee, creditors and equity security holders are empowered to express their objections to the process and to the adequacy of the information in the disclosure statement; in a Chapter 9 case, the creditors and equity security holders do so.

■ With a prepackaged bankruptcy, the plan proponent and the Court are deprived of the input of creditors and the U.S. Trustee regarding the adequacy of the proposed disclosure statement and the solicitation process until after the disclosure statement has been used to solicit votes on the proposed plan. As a "Monday morning quarterback," the Court must review the proposed disclosure statement and the completed solicitation process to verify that substantially all of the creditors received adequate notice of the plan and disclosure statement and had an opportunity to vote upon and object to the plan. A proponent of a prepackaged plan takes a substantial risk that, at the confirmation stage of the case, the Court may determine that the proposed disclosure statement or process of solicitation are inadequate. As noted by Judge Abramson of the Northern District of Texas, the provisions of 11 U.S.C. § 1126(b) amount to a form of "Russian Roulette" because "any shortcoming … would require going back to the drawing board for a bankruptcy regulated disclosure statement hearing with notice, and the usual bankruptcy process toward a hearing on confirmation." *In re Southland Corp.,* 124 B.R. 211, 225 (Bankr.N.D.Tex.1991).

■ Though the Court is sensitive to the District's desire to avoid the expense and time of repeating the disclosure and solicitation process, the Court must, nonetheless, scrutinize the prepetition solicitation process

to assure that substantially all creditors affected by the plan were accorded the basic elements of due process. While it may appear as though the Court is bending over backwards to protect creditors' interests, the District is likewise protected because providing due process to creditors makes a confirmed plan less vulnerable to subsequent attack.

At the confirmation stage of a prepackaged bankruptcy, the court evaluates the process of solicitation in determining whether the acceptances obtained are valid. Fed. R.Bankr.P. 3018(b) provides:

**(b) Acceptances or Rejections Obtained Before Petition.** An equity security holder or creditor whose claim is based on a security of record who accepted or rejected the plan before the commencement of the case shall not be deemed to have accepted or rejected the plan pursuant to § 1126(b) of the Code unless the equity security holder or creditor was the holder of record of the security on the date specified in the solicitation of such acceptance or rejection for the purposes of such solicitation. A holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Code shall not be deemed to have accepted or rejected the plan if the court finds after notice and hearing that the plan was not transmitted to substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for such creditors and equity security holders to accept or reject the plan, or that the solicitation was not in compliance with § 1126(b) of the Code.

■ The District has argued that Fed. R.Bankr.P. 3018 does not require that the prepetition solicitation process be perfect for the acceptances to be valid. I agree, but Fed.R.Bankr.P. 3018 requires that substantially all creditors whose claims are based on a security of record receive a plan, disclosure statement and ballot.

I apply the same standard as if the solicitation process were reviewed prior to the fact. Fed.R.Bankr.P. 3017(e) requires that the beneficial holders of bonds receive the disclo-

sure statement, plan and ballot. "[T]he court shall consider the procedures for transmitting [the plan, the court approved disclosure and related information] to *beneficial holders* of stock, bonds, debentures, notes and other securities and determine the adequacy of such procedures and enter such orders as the court deems appropriate" (emphasis added). Also see, e.g., *In re Southland, supra.* (In a prepackaged Chapter 11 case, the Court looked to the interests of the beneficial holders to determine whether due process requirements had been satisfied.)

After reviewing the Vote Summary and the affidavits evidencing service by mail, I find that there is substantial uncertainty as to whether all beneficial bondholders received the plan, Disclosure Statement and ballot. Understandably, at the time of the prepetition solicitation, the District did not know the names of the beneficial holders of the Bonds which were held in street name by a number of investment firms. When six of the investment firms holding Bonds in street name requested that the District use the services of ADP Proxy Service, the District did so. As proof that ADP transmitted the plan, Disclosure Statement and ballot to beneficial holders, the District filed the affidavit of an ADP representative. The affidavit states that ADP Proxy Service mailed the plan, Disclosure Statement and ballots to "bondholders". Unfortunately, the affidavit does not distinguish between registered and beneficial holders, how the beneficial bondholders were determined or for which investment firms it sent the plan, Disclosure Statement and ballots. Further, the affidavit does not identify the number of beneficial holders to whom the materials were sent, indicate the record date used to determine ownership, or advise the Court of what instructions were given bondholders regarding the return of ballots.

The mere absence of this information might not be critical, but when it is coupled with ambiguities in the Vote Summary, serious doubt about the adequacy of the solicitation is created. With one exception, the Vote

Summary lists each investment firm as casting a single vote, but there is no information to establish that any investment firm held Bonds in street name for only one beneficial holder. Moreover, there are no votes recorded for four of the six firms for whom ADP was to notify beneficial bondholders. One cannot determine how many beneficial holders are represented by each investment firm, nor how many beneficial holders failed to vote.

Although the total dollar amount of Bonds for which no vote was cast is small, approximately 3 percent, each beneficial bondholder has a separate and independent right to due process which is unrelated to the dollar amount of their investment.[3] Whether the failure of some beneficial holders to vote is due to lack of interest or failure to receive the plan, Disclosure Statement and ballot is not resolved by ADP's affidavit. The absence of sufficient information in the affidavit of ADP combined with a potentially significant number of non-voting bondholders creates uncertainty with regard to whether the prepetition solicitation process reached substantially all of the creditors of the District. I therefore conclude that the solicitation process was inadequate and that the acceptances obtained are invalid.

## B. Section 943(b)(6)

Section 943(b)(6) requires that where any regulatory or electoral approval is necessary under applicable nonbankruptcy law in order to carry out any provision of a Chapter 9 plan, such approval either has been obtained or the plan is expressly conditioned on such approval. No election has been held by the District and the Amended Plan is not conditioned upon electoral approval. Thus the Court must determine whether electoral approval is required.

The Amended Plan proposes to replace the Bonds held by Class 1–B and 1–C claimants with plan bonds. These Bonds have maturity dates of December 1, 1997 and December

---

**3.** Based upon representative ownership lots of $5,000, the number of non-voting beneficial holders could range from 5 to 67. The total number of votes cast with regard to the Amended Plan is only 28. Thus, it appears that between 15 percent and 70 percent of the beneficial holders have failed to cast a vote on the Amended Plan.

1, 2006, respectively. A small portion of the plan bonds will be structured as serial bonds due in years 1998 through 2014. The remaining portion, which is in excess of $3 million in principal value, will be structured as a single term bond issue, with a maturity date of December 1, 2033. In essence, Bonds held by Class 1–B and 1–C claimants will be replaced with plan bonds that have maturity dates one to 40 years later than the original issue.

The Objector argues that to issue the plan bonds, an election is required by Title 31 of the Colorado Revised Statutes, under which the District was created and specified provisions of the Title 11 of the C.R.S. entitled Colorado Public Securities Refunding Act (the "Refunding Act"). Under its organic statute, the District is granted limited powers which include the power:

> [T]o borrow money and incur indebtedness and evidence the same by certificates, warrants, notes, debentures, and issue negotiable coupon bonds....

> . . . . .

> [And] to refund any bonded indebtedness of the district without an election; otherwise, the terms and conditions of refunding bonds shall be substantially the same as those of the original issue of bonds of the district....

C.R.S. §§ 31–25–611(1)(e) and (g). Additionally, this statute requires that any bonds issued by the District extend not more than 20 years from the date of issuance. C.R.S. § 31–25–620(1).

The Colorado Refunding Act governs refunding or refinancing of the Bonds. C.R.S. § 11–56–105(1) states that:

> Any revenue obligations or general obligations issued or incurred by any public body may be refunded without an election by the public body issuing or incurring the same, or any successor thereof, except as otherwise provided in this section, in the name of the public body which issued or incurred the obligation or indebtedness being refunded, but subject to provisions concerning their payment, and to any other contractual limitations in the proceedings

authorizing their issuance or otherwise appertaining thereto.

The Objector argues that this provision of the Refunding Act refers to the applicable provisions of Title 31 and therefore requires the District to conduct an election unless the plan bonds are substantially the same as the original 20 year Bonds issued pursuant to C.R.S. § 31–25–611(g).

Alternatively, that Objector argues the Refunding Act specifically authorizes refunding without election only if the reissuance of bonds complies with specific requirements of § 11–56–105(5) of the Refunding Act. The District responds by saying that the Refunding Act authorizes refinancing up to a 40 year term (C.R.S. § 11–56–107(4)(b)) and that the requirement of a voluntary surrender if the Bonds do not mature within 20 years (C.R.S. § 11–56–105(5)) is superseded by the bankruptcy plan approval process under Chapter 9. Based on a somewhat different analysis, I agree with the Objector that an election is necessary.

▮▮▮▮ In order to determine whether an election is required, it is first necessary to resolve whether state or federal law is applicable. The bankruptcy of a public entity is different from that of a private person or concern. Unlike any other chapter of the Bankruptcy Code, Chapter 9 places federal law in juxtaposition to the rights of states to create and govern their own subdivisions. Though Congress intended Chapter 9 to be a forum for reorganization of municipalities, it is clear that Congress did not intend for federal bankruptcy law to supersede or impair the power of the state to create, limit, authorize or control a municipality in the exercise of its political or governmental powers. H.R.Rep. No. 595, 95th Cong., 1st Sess. 263 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6221. The bankruptcy court's jurisdiction should not be exercised lightly in Chapter 9 cases in light of the interplay between Congress' bankruptcy power and the limitations on federal power under the Tenth Amendment. *In re Sullivan County Regional Refuse Disposal District,* 165 B.R. 60, 82 (Bankr.D.N.H.1994).

Chapter 9 expressly does not limit or impair the power of a state to control a munici-

pality in such state in the exercise of the political or governmental powers of such municipality. 11 U.S.C. § 903. The language of § 903 removes any inference that the legislation itself accomplishes anything more than providing a procedure under which municipalities may adjust their indebtedness. 4 *Collier on Bankruptcy* ¶ 903.02 at 903–3 (15th ed. 1992). It is state law rather than the federal law which determines the eligibility of municipalities to seek relief under Chapter 9. 11 U.S.C. § 109(c)(2). Further, state law governs whether any regulatory or electoral approval is necessary for plan confirmation. 11 U.S.C. § 943(b)(6).

█ Where a plan proposes action not authorized by state law, or without satisfying state law requirements, the plan cannot be confirmed. *Matter of Sanitary and Improvement District No. 7,* 98 B.R. 970 (Bankr.D.Neb.1989). The Chapter 9 solicitation and voting process does not replace or supersede the state requirements for electoral approval. Thus the issue is whether, under Colorado law, the District is required to obtain electoral approval in order to issue plan bonds. I conclude that Colorado law requires electoral approval of the refunding proposed in the Amended Plan.

I have been unable to find any reported authority which interprets the pertinent provisions of Title 31 of the Colorado Revised Statute and of the Refunding Act in light of this issue. I therefore implement the general rules of statutory construction, which require application of the plain meaning of a statute, when readily apparent, while accounting for and applying such meaning in the whole context of the statute. *U.S. National Bank of Oregon v. Independent Insurance Agents of America,* — U.S. ——, ——, 113 S.Ct. 2173, 2182, 124 L.Ed.2d 402 (1993).

In analyzing the provisions of Title 31 and Title 11 of the Colorado Revised Statutes, I observe that Title 31 grants the District the power to refund bonded indebtedness without electoral approval if the terms and conditions of the refunding are substantially the same as the original issue. C.R.S. § 31–25–611. Therefore under Title 31, the District clearly can avoid an election if the plan bonds have substantially the same terms as those currently held by Class 1–B and 1–C claimants.

The District, as a public body as defined by C.R.S. § 11–56–103(7), also has alternate authority to issue the proposed plan bonds under the Refunding Act without electoral approval. The intent of the Refunding Act is to provide a consistent mechanism for refunding any revenue obligation, any general obligation bond or any other lawful general obligation indebtedness by a public body of the state of Colorado. C.R.S. § 11–56–102. The Refunding Act is to be liberally construed to fulfill this legislative intent. C.R.S. § 11–56–117. Bonds may be issued "without regard to the provisions of any other law, and if so issued, insofar as the provisions [of the Refunding Act] are inconsistent with the provisions of any other law, the provisions of [the Refunding Act] shall be controlling". C.R.S. § 11–56–116.

The provisions of the Refunding Act regulate numerous facets of refunding public bond issues. The Act establishes the acceptable purposes for refunding (C.R.S. § 11–56–104), the provisions of refunding bonds (C.R.S. §§ 11–56–106, 107 and 111), the application of bond proceeds (C.R.S. §§ 11–56–108 and 109), the sources of repayment of refunding bonds (C.R.S. § 11–56–110), and the procedure through which the bonds may be refunded (C.R.S. §§ 11–56–104.5, 105, 111, and 114). C.R.S. § 11–56–107(4), upon which the District relies, limits any refinanced bonds to a maturity of 40 years, but it does not specify whether and to what extent an election is required.

Whether electoral approval is necessary is addressed in C.R.S. § 11–56–105(1) which provides that no election is required "except as otherwise provided in this section" but "subject to provisions concerning their payment, and to any other contractual limitations in the proceedings authorizing their issuance, or otherwise appertaining thereto." The Objector suggests that this language refers to the Title 31 provisions under which the District was created and because the proposed plan bonds do not satisfy Title 31, they cannot be issued under the Refunding Act without electoral approval.

I believe a better reasoned interpretation of C.R.S. § 11–56–105(1) is that electoral approval is not required if the specific provisions of the Refunding Act are satisfied. Section 105(5) of the Refunding Act sets out two alternatives allowing for the issuance of refunding bonds without an election. Either the refunded bonds must mature, be payable and be callable within 20 years of issuance or bondholders must voluntarily consent to surrender of their bonds.

In this case, the Amended Plan satisfies neither alternative. The plan bonds do not mature within 20 years after issuance nor has the District obtained the agreement of all bondholders to surrender their Bonds. In fact, the Objector specifically states it refuses to voluntarily surrender its Bonds.

The District argues that the voluntary surrender provision in C.R.S. § 11–56–105(5) is superseded by the voting process for the approval of a Chapter 9 plan. I am not persuaded. Federal law cannot obliterate or supersede requirements for elections imposed by Colorado law. Chapter 9 provides only a forum and a mechanism for reorganization; state law establishes the eligibility and substantive requirements for and limitations upon reorganization. It is not within the authority of this Court to modify or reject these conditions imposed by the State of Colorado upon the District's efforts to reorganize.

In summary, there are three circumstances in which no election would be required: (1) the plan bonds have substantially the same terms and conditions as the original issue, (2) the plan bonds mature, are callable and are able to be paid within 20 years of issuance, or (3) all bondholders voluntarily agree to surrender their Bonds. Because none of these requirements are satisfied, I conclude electoral approval is required prior to the issuance of the plan bonds. As electoral approval has not been obtained and the Amended Plan is not conditioned upon such approval, the Amended Plan is not confirmable under 11 U.S.C. § 943(a)(6).

**C. Section 943(b)(7)**

 Finally, I find that the Amended Plan is not feasible and cannot be confirmed pursuant to 11 U.S.C. § 943(7). The Objector argues that the Amended Plan cannot be confirmed because the District lacks legal authority to direct the use of Letter of Credit proceeds for payment only of Class 1–A claimants rather than payment of all claimants on a pro rata basis. The District presented no evidence on this issue, but its Counsel argues that consistent with its past actions the Trustee would voluntarily draw on the Letter of Credit and pay according to the terms of the Amended Plan upon the request of the District. Alternatively, the District argues that the Amended Plan can modify the obligations of the Trustee under the Trust Agreement, pursuant to 11 U.S.C. § 1123(a)(5)(F) as incorporated by 11 U.S.C. § 901.

Assuming the District's bond indebtedness is restructured according to the Amended Plan, the pivotal issue is whether the Trustee can be compelled to make payment to Class 1–A claimants from the Letter of Credit proceeds. At the heart of this dispute is the issue of feasibility.

The Trustee is not a party in this case, was not provided the opportunity to and did not vote on the Amended Plan and therefore, is not bound by the terms of the Amended Plan. Furthermore, the Trustee did not testify that it will draw upon the Letter of Credit to fund the premature payments of Bonds due in 1995 and 1996.

The Amended Plan does not purport to change the Trust Agreement or the Trustee's duties thereunder. Although the Trustee may have acted in concert with the District in the past, its rights and duties are not necessarily synonymous with the wishes of the District; the Trustee's rights and obligations are determined by the Trust Agreement.

The payment required under the Amended Plan appears to be contrary to the terms of the Trust Agreement. By its terms, the Trust Agreement is irrevocable. The Trustee is required to perform only those duties specifically set forth in the Trust Agreement. No implied covenants or obligations may be read into the Trust Agreement. The Trustee is required to hold the Letter of Credit in a

collateral fund and draw upon it solely for the purpose of paying the interest and principal on the Bonds *as they come due.* The Amended Plan proposes prepayment to Class 1–A claimants who hold Bonds maturing in 1995 and 1996, which is contrary to the payment instruction under the Trust Agreement.

As there is no legal or practical assurance that payment to Class 1–A can be made from the Letter of Credit proceeds, I find that the Amended Plan is not feasible.

### III. CONCLUSION

The Amended Plan does not comply with the confirmation requirements set out 11 U.S.C. §§ 943(b)(1), (6) and (7). Accordingly,

**IT IS ORDERED** that confirmation of the Amended Plan is hereby **DENIED.**