## In re EMBASSY PROPERTIES NORTH, LIMITED PARTNERSHIP, Debtor.

**Bankruptcy No. 93–22037–11.**

United States Bankruptcy Court,
D. Kansas.

May 24, 1996.

---

Jonathan A. Margolies of McDowell, Rice & Smith, P.C., Kansas City, Missouri, for Debtor.

Betsy Morgan Garvin of Watson & Marshall L.C., Kansas City, Missouri, for College Life Insurance Company of America.

Cynthia L. Reams of Weisenfels & Vaughn, Kansas City, Missouri, for Farmers New World Life Insurance Company.

Fran A. Suarez, Prairie Village, Kansas, for the Resolution Trust Corporation, as Receiver for Blue Valley Federal Savings & Loan Association.

## MEMORANDUM OPINION [1]

JOHN T. FLANNAGAN, Bankruptcy Judge.

By filing for Chapter 11 relief, Embassy Properties North, Limited Partnership, has prevented College Life Insurance Company of America from foreclosing on a mortgage and rent assignment it holds on Frolics Plaza Shopping Center. Rents in excess of those paid to operate Frolics Plaza have accumulated in a segregated account under an agreement of the parties. Under state law, Embassy holds title to the land and rents while College Life's interest in the rents is only an unexercised power to apply them to its debt when it can take possession of the land or rents, which the automatic stay prevents during the reorganization case. Now that the bankruptcy case is several years old and nearing a confirmation hearing, should College Life's secured claim include the accumulated rents, making it oversecured and requiring Embassy to pay postpetition interest on the claim and a greater present value amount to satisfy the confirmation standards of the Code?

## Background

Although this is a Kansas bankruptcy case, Embassy is a Missouri limited partnership that owns North Oak Plaza Shopping Center, Tiffany Plaza Shopping Center, and Frolics Plaza Shopping Center, each located in Missouri and financed by a different lender. To help it work out its financial difficulties with its lenders, Embassy filed this voluntary Chapter 11 case on October 20, 1993.[2] Except for College Life, which contests the composition of its secured claim, Embassy has reached accord with the other lenders.

Although College Life asserts that it owns "a valid, perfected first mortgage lien on Frolics Plaza and an assignment of the rents and leases therefrom,"[3] Embassy has not conceded that College Life holds a security interest in the postpetition rents. But after filing its petition, Embassy did agree to pay the operating expenses of Frolics Plaza from the rents and to segregate any remaining rents in a deposit account.

Later, the parties agreed to use segregated rents to pay for replacing the roof on Frolics Plaza. Accordingly, Embassy spent approximately $42,000 for the roof replacement. After deducting that outlay, the segregated account contained $46,145.34 through December 31, 1994. In addition, Embassy held $4,500 of the excess rents in an operating reserve account under the agreement.

To resolve their dispute, the parties have presented a pretrial order and a series of briefs.[4] In the pretrial order, they stipulate that when Embassy filed for Chapter 11 relief, the value of Frolics Plaza was

1. The debtor, Embassy Properties North, Limited Partnership ("Embassy" or "debtor"), appears by its attorney, Jonathan A. Margolies of McDowell, Rice & Smith, P.C., Kansas City, Missouri; College Life Insurance Company of America ("College Life") appears by its attorney, Betsy Morgan Garvin of Watson & Marshall L.C., Kansas City, Missouri; Farmers New World Life Insurance Company ("Farmers") appears by its attorney, Cynthia L. Reams of Weisenfels & Vaughn, Kansas City, Missouri; and the Resolution Trust Corporation, as Receiver for Blue Valley Federal Savings & Loan Association ("RTC/Receiver"), appears by Fran A. Suarez, Prairie Village, Kansas.

2. The parties have stipulated in the pretrial order that the Court has jurisdiction over the parties and subject matter of the action; that venue in this district is proper; that all necessary and indispensable parties are joined; and that the

Court may try this adversary proceeding to final judgment. The Court finds independently of the stipulation that this proceeding is core under 28 U.S.C. § 157 and that the Court has jurisdiction under 28 U.S.C. § 1334 and the general reference order of the District Court effective July 10, 1984 (D.Kan.Rule 83.8.5).

3. Pretrial Conference Order filed June 30, 1995, at 2.

4. See "College Life Insurance Company of America's Pretrial Brief" filed April 26, 1995; "Debtor's Brief on Legal Issues in Dispute with College Life Insurance Company of America" filed May 30, 1995; "College Life Insurance Company of America's Reply Brief to Debtor's Brief on Legal Issues in Dispute" filed June 12, 1995; and "Debtor's Reply Brief on Legal Issues in Dispute with College Life Insurance Company of America" filed June 12, 1995.

$350,000. Since College Life's amended proof of claim is for $357,787.26, it is an undersecured creditor as of the filing date.

College Life values its secured claim at $400,645.34—real estate worth $350,000 at filing per the stipulation plus the excess rents in the segregated account totaling $46,-145.34 and in the operating account totaling $4,500 as of December 31, 1994. Actually, the claim is greater because the excess rents have accrued since December 1994 to an amount unknown to the Court. If College Life's valuation method is used, it would become an oversecured creditor entitled to postpetition interest on its claim under § 506(b) to the extent of the excess collateral value.

### § 502(b)

 Under College Life's theory, the Court should value its secured claim at or near confirmation. One obstacle to this approach is § 502(b). This Code section commands the Court to determine the amount of a claim as of the petition date and allow such claim in that amount:

> Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, *shall determine* the amount of such claim in lawful currency of the United States *as of the date of the filing of the petition,* and *shall allow* such claim in such amount....[5] (Emphasis added.)

Because this section speaks of allowing a "claim," rather than a "secured claim," College Life says it is not germane. Rather, it champions § 506(a). Since § 506(a) deals with secured claims but does not mention § 502(b), College Life concludes that § 502(b) does not apply to the valuation of a secured claim.

But this reasoning neglects § 1111(b)(1)(A), which applies in this Chapter 11 case and supplies the reference to § 502 absent from § 506(a). This statute confirms that, like unsecured claims, secured claims should be allowed or disallowed under § 502(b).

> A *claim secured by a lien on property of the estate* shall be *allowed* or disallowed *under section 502* of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse....[6] (Emphasis added.)

Thus, when read with § 1111(b)(1)(A), § 502(b) commands that secured claims shall be determined and allowed as of the date of the filing of the petition. Since valuation of a secured claim must coincide with or precede its determination and allowance, § 502(b) edicts that the Court fix the value of a secured claim as of the date of the petition.

### § 506(a)

 Even if College Life were correct that § 502(b) does not apply to secured claims, it reads too much into § 506(a).

This statute consists of two sentences, the first of which defines unsecured and secured claims. It begins with the concept of an "allowed claim of a creditor secured by a lien on property in which the estate has an interest." This concept defines a "secured claim" by reference to the extent of the value of the creditor's interest in the estate's interest in the property subject to the lien:

> An *allowed claim* of a creditor secured by a lien on property in which the estate has an interest ... is a *secured claim* to the extent of the *value* of such creditor's interest in the estate's interest in such property ... and is an *unsecured claim* to the extent that the *value* of such creditor's interest ... is less than the amount of *such allowed claim.*[7] (Emphasis added.)

Obviously, two property interests are involved: the estate's interest in property and the creditor's interest in the estate's interest in the property. When the sentence uses the word "property," it refers to the estate's interest, and when it uses the word "value," it refers to the creditor's interest in the estate's interest in the property. Therefore, two valuations must be made to determine

---

**5.** 11 U.S.C. § 502(b).

**6.** 11 U.S.C. § 1111(b)(1)(A).

**7.** First sentence of 11 U.S.C. § 506(a).

the value of a secured claim. First, the appraiser must value the estate's interest in the property, then the creditor's interest in the already valued property. Once the value of the secured claim is determined, it is deducted from the amount of the total allowed claim; any remainder of the allowed claim is the amount of the unsecured claim.

The second sentence of § 506(a) begins with the words "[s]uch value," which clearly refer to the "value" concept mentioned in the first sentence:

> Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use *or on a plan affecting such creditor's interest.*[8] (Emphasis added.)

Since the first sentence uses the word "value" only when referring to the creditor's interest, the reference is to valuing a secured claim.

The remainder of the sentence directs that the value of a secured claim shall be determined: (1) in light of the purpose for valuing it, and (2) in light of the proposed disposition or use of the estate's interest in the property subject to the secured claim, and (3) in conjunction with any hearing on the disposition or use of the estate's interest in the property, or (4) in conjunction with any hearing on a plan affecting the secured claim.

The command to determine a secured claim in conjunction with any hearing on a plan affecting it has been taken to mean, as College Life takes it, that a valuation or revaluation of a secured claim must be made in conjunction with a hearing on plan confirmation.[9] College Life cites the following legislative history as support for this reading: "To illustrate, a valuation early in the case in a proceeding under sections 361–363 would not be binding upon the debtor or creditor at the time of confirmation of the plan."[10] But this legislative history is inconclusive about when the value of a secured claim must be set. While the history confirms that the

debtor or creditor are not bound by a valuation made early in the case, it falls short (1) of declaring that if the Court has previously valued a secured claim "as of the petition date," it must revalue that secured claim "as of a date near confirmation;" (2) of declaring that if near confirmation the Court values a secured claim retroactively "as of the petition date," the debtor or creditor would not be bound by that valuation; (3) of declaring that if the Court has not valued a secured claim "as of the petition date," it is barred from doing so at a time near confirmation.

Essentially, all that § 506(a) does then is give the Court broad discretion to value a secured claim as of the petition date or as of the confirmation date (or some other date) in conjunction with a confirmation hearing. The subsection's legislative history confirms that changes in value after an early valuation (or perhaps other changes) might call for another valuation at confirmation. But the statute itself does not foreclose the Court from fixing the value of a secured claim as of the petition date even though it acts at a time near confirmation.

### § 1129(a)(7)

Next College Life argues that the reference to "the effective date of the plan" in § 1129(a)(7)(A)(ii), the best-interest-of-creditors test, requires the Court to value a secured claim near confirmation. This Code section provides:

> (7) With respect to each impaired class of claims or interests—
>
> (A) each holder of a claim or interest of such class—
>
> (i) has accepted the plan; or
>
> (ii) will receive or retain under the plan on account of such claim or interest *property of a value, as of the effective date of the plan,* that is not less than the amount that such holder would so receive or retain if the debtor were liqui-

---

**8.** Second sentence of 11 U.S.C. § 506(a).

**9.** *In re Landing Associates, Ltd.,* 122 B.R. 288 (Bankr.W.D.Tex.1990).

**10.** S.Rep. No. 989, 95th Cong., 2d Sess. 68 (1978), *reprinted in* U.S.Code Cong. & Ad News 5787, 5584.

dated under chapter 7 of this title on such date.... [11] (Emphasis added.)

Similar language appears in § 1129(b)(2)(A)(i)(I), the so-called cramdown provision:

(2) For purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim *deferred cash payments* totaling at least the allowed amount of such claim, *of a value, as of the effective date of the plan,* of at least the value of such holder's interest in the estate's interest in such property.... [12] (Emphasis added.)

What must be of a "value, as of the effective date of the plan" under these two sections of the Code? The answer is "property" under the best-interest-of-creditors test, and "deferred cash payments" under the cramdown provision. Obviously, each provision is referring to the value that a plan must distribute to claim holders "as of the effective date of the plan," not the value of the collateral that measures a secured claim. The "property" or "deferred cash payments" the plan distributes to claim holders simply must have a present value of a least the value of the secured claim as of the effective date of the plan. This implies that the allowed secured claim should be determined before confirmation. Then at confirmation the Court can verify that the present value of plan distributions are equal to or exceed the amount of the previously determined secured claim.

### "Allowed Claims"

The cramdown provision provides a further reason for valuing College Life's secured claim early in the case. Referring to a secured claim, the section states that "deferred cash payments" made under a plan must total at least the "allowed amount of such claim." [13] This concept of "allowed claims," which appears in a number of Code sections, reinforces the idea that claims should be determined early in the case, considerably before confirmation. Only classes of "allowed claims" can vote on the reorganization plan.[14] Voting on a plan must occur before confirmation. Accordingly, if allowance and valuation must occur before a vote, delaying valuation until confirmation is unworkable.

In addition to the special treatment the Code prescribes for cramming down secured claims, it also guarantees definitive treatment for other kinds of claims as a prerequisite to confirmation of a plan. Unless these claims (or classes of claims) are given the prescribed treatments, the plan cannot be confirmed. In prescribing these treatments, the Code uses the words "allowed": "allowed administrative claims," [15] "allowed priority claims," [16] "allowed tax claims," [17] "allowed unsecured claims," [18] and "allowed liquidation preferences." [19] Unless such claims are "allowed" before confirmation, how can the Court determine whether the plan honors the treatments the Code guarantees them?

### The "Interest" in Rents

■ Bankruptcy courts are in general agreement that state law defines the extent of a mortgagee's claim to rents and profits.[20] Since Frolics Plaza is located in Missouri, the real estate laws of that state control.

---

11. 11 U.S.C. § 1129(a)(7)(A)(ii).

12. 11 U.S.C. § 1129(b)(2)(A)(i)(I).

13. 11 U.S.C. § 1129(b)(2)(A)(i)(I) and (II).

14. 11 U.S.C. § 1126(a).

15. 11 U.S.C. § 1129(a)(9)(A).

16. 11 U.S.C. § 1129(a)(9)(B)(i) and (ii).

17. 11 U.S.C. § 1129(a)(9)(C).

18. 11 U.S.C. § 1129(b)(2)(B)(i).

19. 11 U.S.C. § 1129(b)(2)(C).

20. *Butner v. U.S.,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

■ As mentioned in *South Pointe Associates*,[21] Missouri follows the lien theory of mortgages. Under this theory, rents are incident to possession.[22] Accordingly, the Missouri bankruptcy courts have held that before a mortgagee can collect rents, it must take possession of the mortgaged property or equivalent action:

> The law in Missouri and in this District is clear in that an assignee-mortgagee is permitted to: (i) collect rents upon a mortgagor's default in payment of the mortgage debt, and (ii) to apply these rents to the reduction of the mortgage debt. *In re Northwest Commons, Inc.*, 136 B.R. 215, 219 (Bankr.E.D.Mo.1991). However, to activate its right to collect the rents, the mortgagee must enter into actual possession of the property or take some equivalent action.[23]

Several Missouri bankruptcy cases exemplify the equivalent action principle. Two decisions hold that where the mortgagee takes action equivalent to possession before the mortgagor files for bankruptcy, the postpetition rents do not become property of the bankruptcy estate.[24] A third decision holds that when the mortgagee fails to take such action before the mortgagor files for bankruptcy, the postpetition rents become property of the bankruptcy estate.[25]

■ Before Embassy filed this bankruptcy case, it held title to Frolics Plaza and had the use of its rental income. College Life's recorded mortgage encumbered Frolics Plaza and gave constructive notice of its lien to subsequent purchasers and encumbrancers. Thus, Embassy could not convey away Frolics Plaza free of College Life's lien. As to the rents, however, the Missouri law is different. Although College Life held a recorded rent assignment, it could not prevent Embassy from passing the rents to third parties free of any lien. So long as College Life had not taken possession of Frolics Plaza or equivalent action against the rents, College Life could not recover those rents from any recipient. This was true even after Embassy defaulted on the mortgage.

Missouri law therefore recognizes that Embassy could not be expected to hold and operate income producing property without the use of its income. While Embassy was in possession of Frolics Plaza, it had to pay operating expenses, such as payroll, utilities, maintenance, real estate and income taxes, accounting fees, etc. Otherwise, neither College Life nor Embassy could have conducted business.

What was College Life's state law "interest" in the rents when this case was filed? So far as the pretrial order and the briefs show, at the time Embassy filed for Chapter 11 relief, College Life had not taken possession of Frolics Plaza, nor had it taken any equivalent action toward the rents under Missouri law. Therefore, its state law "interest" in the rents when this case was filed was not a right that constitutes a lien.

In Hohfeldian terms,[26] every "right" has a correlative "duty." This is evident with Col-

---

21. *In South Pointe Associates*, 161 B.R. 224, 226 n. 1 (Bankr.E.D.Mo.1993).

22. PATRICK A. RANDOLPH JR., *The Mortgagee's Interest in Rents: Some Policy Considerations and Proposals*, 29 KAN.L.REV. 1, 13 (1980) ("The uniform view is that rents are an incident of possession and belong to the person entitled to possession . . . .").

23. *In re South Pointe Associates*, 161 B.R. 224, 226 (Bankr.E.D.Mo.1993), citing *Grafeman Dairy Co. v. Mercantile Club*, 241 S.W. 923, 927 (Mo. 1922) (en banc); *Netzeband v. Knickmeyer Fleer Realty & Inv. Co.*, 103 S.W.2d 520, 522 (Mo.Ct. App.1937); *In re Stuckenberg*, 374 F.Supp. 15, 17 (E.D.Mo.1974), *aff'd*, 505 F.2d 1250 (8th Cir.

1974); *Pine Lawn Bank and Trust Co. v. M.H. & H., Inc.*, 607 S.W.2d 696, 700 (Mo.Ct.App.1980).

24. *See In re Northwest Commons, Inc.*, 136 B.R. 215 (Bankr.E.D.Mo.1991), and *In South Pointe Associates*, 161 B.R. 224 (Bankr.E.D.Mo.1993).

25. *In re Mews Associates, L.P.*, 144 B.R. 867 (Bankr.W.D.Mo.1992).

26. WESLEY NEWCOMB HOHFELD, FUNDAMENTAL LEGAL CONCEPTIONS AS APPLIED IN JUDICIAL REASONING (Walter Wheeler Cook, ed., 1923). In his work Hohfeld set forth eight fundamental conceptions in terms of which he believed all legal problems could be stated:

(Footnote 26 continued on p. 179.)

lege Life's lien on Frolics Plaza, which is a right. Embassy has a duty not to interfere with College Life's right in the land. Embassy has no-right to convey away Frolics Plaza free of College Life's mortgage lien. And third parties with notice have no-right to obtain an interest in the land superior to College Life's lien.

But since College Life has not taken possession of Frolics Plaza or equivalent action toward the rents, Embassy and its vendors are "privileged" to deal with the rents as they wish and College Life has "no-right" to interfere. Until it has acted, College Life has no-right in the rents and Embassy has no duty to refrain from using the rents to pay the claims of third parties. And those third parties have no duty to College Life to refrain from applying the rents to the satisfaction of their claims. Embassy is privileged to spend the rents or grant a third party a lien in the rents and College Life has no-right to interfere. Accordingly, College Life has no-rights in the rents that the state law will recognize and enforce until it has acted to possess the rents.

What College Life does hold is an unexercised state law "power" to possess the rents. Its correlative under Hohfeld's classification is a "liability;" not a liability in the sense of a present or future obligation, but one in the sense of Embassy's exposure to having its legal relationships changed by College Life's exercise of its power to possess the rents. If College Life had exercised its power to possess the land or the rents before this case was filed, it would have acquired rights in the rents and Embassy and third parties would have been subject to duties that would pre-

vent their interference with the rents. Embassy could not then have freely spent the rents and third parties could not have received them for application to their claims free of College Life's lien. This absence of any legally cognizable "right" to rents in a mortgagee until it gets possession of the rents, or the equivalent, is the paramount characteristic of a rent assignment for security in states following the lien theory of mortgages. In short, College Life's only present interest in rents under Missouri law is an unexercised state law power to possess them, not a lien.

When Embassy filed bankruptcy, College Life could no longer exercise its power because of the automatic stay. College Life is under a disability because it cannot exercise its power. Embassy is immune from the power while the stay exists. All College Life can do is wait until its disability is removed by the lifting of the automatic stay. When that happens, Embassy will no longer be immune and College Life can once again exercise its state law power to possess the land and the rents.

### Rents Subsumed

In a prior decision, this Court adopted the suggestion that rents from real property are largely subsumed within the value of the land producing them.[27] In its brief, College Life disputes this proposition. But its actions belie its words. When this case began, it negotiated a budget ensuring that Embassy would pay the operating expenses of Frolics Plaza and that the tenants would continue to occupy the property and pay their rents. The effect, of course, protects the value of

---

| | | right | privilege | power | immunity |
|---|---|---|---|---|---|
| Jural Opposites: | - | | | | |
| | | no-right | duty | disability | liability |

| | | right | privilege | power | immunity |
|---|---|---|---|---|---|
| Jural Correlatives: | - | | | | |
| | | duty | no-right | liability | disability |

The only word that has a special meaning is liability. Hohfeld used it not to mean duty or obligation, but instead in the sense of exposure to having one's legal status changed.

**27.** *In re Barkley 3A Investors, Ltd.,* 175 B.R. 755 (Bankr.D.Kan.1994) (holding that where excess

rents were assumed to be cash collateral and where the equities of the case required, the debtor could use the rents and the mortgagee is adequately protected because its interest extends to future rents).

180

College Life's lien on the property. This arrangement confirms that the value of Frolics Plaza is dependent on the rents. Unless Embassy has other funds, an unlikely prospect under its circumstances, it could not maintain Frolics Plaza without using the rental income.

This symbiotic relationship between the value of the land and its yield justifies a special treatment for the rents within a reorganization case. Therefore, even if the parties had not agreed to a budget of operating expenses for Frolics Plaza and a segregation of excess rents in a deposit account, if asked this Court would have required as much to support the value of Frolics Plaza during the case. This requirement would have stemmed from College Life's right to adequate protection of its lien on the land, not from its interest in rents, which is merely an unexercised power, not a lien. To protect the value of the mortgage lien on the land, the value of the land must be maintained, which can only be accomplished with the rents. Obviously, Embassy should not be allowed to fritter away the rents that are necessary to uphold the value of Frolics Plaza, nor would it wish to do so if it were acting in good faith toward a reorganization plan. And it should not be allowed to spend the rents unless they are applied to advance the reorganization effort.

For the reasons stated, I conclude that College Life holds no lien in the rents (excess or otherwise) to justify adding them to its secured claim. If this case is dismissed, College Life will still have its lien on Frolics Plaza and its power to appropriate the rents accruing thereafter, just as it did under state law before this case was commenced.

### Roof Replacement

 When the Court approved the agreement to replace the roof on Frolics Plaza, College Life reserved its right to argue about the effect of the transaction. Now College Life postulates that the expenditure increased the value of the real estate by a corresponding amount and that under *Dewsnup v. Timm* [28] that value should be included in its secured claim. It does not show, however, to what extent, if at all, the replacement increased the value of Frolics Plaza (other than to assume the value increased by the cost of the replacement) nor

does it show that there has been a general appreciation in the value of the shopping center during the pendency of the case.

*Dewsnup* is distinguishable from this case. It was a Chapter 7 case where the contest was between a mortgagee and the debtor/mortgagor. The question was whether the mortgage lien covered postpetition economic appreciation on real estate abandoned from the bankruptcy estate. In that context, the Supreme Court held that the mortgagee could have the benefit of the appreciation on property no longer in the estate. Unlike *Dewsnup*, this is a Chapter 11 reorganization case involving postpetition rents and creditors other than just the mortgagee. These creditors will benefit by the payment of some part of their claims if the accumulated rents in the estate contribute to confirming a reorganization plan. The ultimate question here is whether confirmation of that plan should be frustrated by requiring College Life's secured claim to include the accumulated rents, making it oversecured and requiring Embassy to pay postpetition interest on the claim and a greater present value amount to satisfy the confirmation standards of the Code.

If the roof replacement increased the value of Frolics Plaza, that value is covered by the mortgage lien.

### Amount of Secured Claim

The amount of College Life's allowed secured claim is $350,000. As an undersecured creditor, College Life is not entitled to postpetition interest. Using the amount stated in its uncontested amended proof of claim that relates back to the filing of the case, its unsecured deficiency claim is $7,787.26.

### Remaining Questions

The remaining questions raised in the pretrial order are either premature, moot, factual, ignored in the briefs, or answered herein.

The foregoing discussion shall constitute findings of fact and conclusions of law under Fed.R.Bankr.P. 7052 and Fed.R.Civ.P. 52(a).

IT IS SO ORDERED.

---

**28.** 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992); *In re Dewsnup*, 908 F.2d 588 (10th Cir. 1990).