## In re THE FARMERS COOPERATIVE ASSOCIATION, Debtor.

### No. 00–22385–11–TLM.

United States Bankruptcy Court,
D. Kansas.

April 19, 2005.

---

**14.** 2003 is the taxable year preceding the petition's taxable year.

John Cruciani, Plaza Colonnade, Kansas City, MO, for FCA Post Confirmation Trust.

Patrick A. Murphy, San Francisco, CA, Martin R. Ufford, Wichita, KS, for Co-Bank, ACB.

---

* Of the Northern District of Oklahoma, sitting by designation.

1. Unless otherwise noted, all statutory references are to sections of the United States

## MEMORANDUM OPINION

TERRENCE L. MICHAEL, Bankruptcy Judge.*

Presently before the Court is the Motion to Permit Filing, Allowance, and Payment of Claim for Post–Confirmation Attorneys Fees (the "Motion") filed by CoBank, ACB ("CoBank"). The Motion has drawn an objection from the FCA Post–Confirmation Trust (the "Trust"). The dispute provides a fascinating look at the pitfalls of a partial settlement. The parties' remaining differences have apparently resulted in hundreds of thousands of dollars in fees and expenses. CoBank asks the Court to shift most, if not all, of its expenses to the Trust. The Court, after thorough review of the stipulated facts and the arguments of the parties, declines the invitation. The following findings of fact and conclusions of law are made pursuant to Federal Rule of Civil Procedure 52 and Federal Rule of Bankruptcy Procedure 7052, made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 9014.

### Jurisdiction

To the extent the Motion implicates the provisions of 11 U.S.C.A. § 506, the Court has jurisdiction over this contested matter pursuant to 28 U.S.C.A. § 1334(b).[1] Reference to the Court of this adversary proceeding is proper pursuant to 28 U.S.C.A. § 157(a). Issues relating to 11 U.S.C.A. § 506 are core proceedings as contemplated by 28 U.S.C.A. § 157(b)(2)(A). To the extent the Court has reservations regarding its jurisdiction over issues raised in the Motion, they are discussed below.

### Findings of Fact

The present dispute arises out of the lender-borrower relationship between Co-Bank and the Farmers Cooperative Asso-

Bankruptcy Code, 11 U.S.C.A. § 101 et seq. (West 2005). All other references to federal statutes and rules are also to West 2005 publications.

ciation (the "FCA"). The parties have provided the Court with a copy of the Master Loan Agreement (the "MLA") between CoBank and the FCA. The MLA is dated "as of January 31, 2000" and contains the following provision:

18. To the extent allowed by law, the Company [FCA] agrees to pay all reasonable out-of-pocket costs and expenses (including the fees and expenses of counsel retained by CoBank) incurred by CoBank in connection with the origination, administration, collection, and enforcement of this agreement and the other Loan Documents, including, without limitation, all costs and expenses incurred in perfecting, maintaining, determining the priority of, and releasing any security for the Company's obligations to CoBank, and any stamp, intangible, transfer, or like tax payable in connection with this agreement or any other Loan Document.

Under the terms of the MLA, CoBank claims to hold a lien upon virtually all of the assets owned by the FCA. Neither the FCA nor the Trust have admitted the validity of the CoBank lien.

### The Bankruptcy Case

On September 27, 2000, the FCA filed a petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Kansas (the "Bankruptcy Case"). CoBank filed a secured proof of claim in the prepetition amount of $10,649,039.37, plus post-petition interest, fees and costs as may be allowed by law. CoBank claimed a lien upon most, if not all, of the property owned by the FCA. The extent and validity of the CoBank lien was a matter of dispute between the parties. The FCA continued its business operations, and entered into an agreed order with CoBank allowing for the use of cash collateral.[2]

Apparently believing that the best defense is a good offense, CoBank pursued various avenues of litigation to establish the validity of its claim and to compel its payment outside of the auspices of a Chapter 11 plan. On April 27, 2001, CoBank filed its Motion for Treatment as an Oversecured Creditor (the "CoBank Oversecured Motion").[3] This motion drew objections from the FCA, the Official Unsecured Creditors Committee, and the Official Equity Security Holders Committee.[4] In late June of the same year, CoBank filed an adversary proceeding against the FCA and the Committees (the "CoBank Adversary"). In the CoBank Adversary, CoBank sought a judgment: (1) establishing the amount and validity of its claim; (2) ruling that neither the FCA nor either of the Committees could assert any claims against CoBank under §§ 547, 548, or 550 of the Bankruptcy Code; (3) finding that the FCA and/or the Committees had no right of setoff or any other legal means to reduce the liability of the FCA to CoBank; and (4) holding that all post-petition expenses incurred by CoBank in connection with the debt owed to it by the FCA were reasonable and properly recoverable by CoBank. Not surprisingly, the FCA and the Committees took issue with the position advanced by CoBank in the CoBank Adversary, and timely filed answers in the adversary proceeding.

In August of 2001, CoBank filed a motion for relief from the automatic stay and

---

**2.** *See Stipulation of Facts, Docket No. 958,* Exhibit B.

**3.** *Docket No. 370.*

**4.** The Official Unsecured Creditors Committee and the Official Equity Security Holders Committee shall hereafter be collectively referred to as the "Committees."

for abandonment of property (the "Co-Bank Relief Motion"), in which it argued that the retention of some $10,600,000 in cash was burdensome to the estate.[5] Co-Bank asked the bankruptcy court to relieve the FCA of this millstone and order the immediate payment of CoBank's pre-petition claim. The FCA and the Committees filed objections to the CoBank Relief Motion. Judge Flannagan [6] ordered that the CoBank Adversary, the CoBank Oversecured Motion, and the CoBank Relief Motion be tried together, and that he would limit his inquiry to the validity of the liens claimed by CoBank and the entitlement, if any, of CoBank to post-petition, interest, costs, and attorneys' fees. Judge Flannagan informed the parties that he would not consider any lender liability claims, avoidance claims, or other claims which might be pursued by the FCA or the Committees against CoBank.

On November 9, 2001, Judge Flannagan (with the apparent consent of the parties) ordered the parties to engage in mediation. Those efforts were successful to a point. Five days later, the parties filed a motion asking the bankruptcy court to approve their compromise. In an order entered on December 7, 2001 (the "Compromise Order") [7], Judge Flannagan approved the parties' compromise. The Compromise Order (the agreement itself was not made a part of the record) contained the following provisions:

a. Upon entry of an order approving the Application, Debtor shall pay to Co-Bank the sum of $10,649,039.37, which is the stipulated amount of the unpaid balances of the seasonal line and the term note owed CoBank as of the Petition Date. The payment of the $10,649,039.37 must be made on or before December 31, 2001.

b. Upon entry of an order approving the Application, Debtor shall transfer Debtor's CoBank stock to CoBank in full and complete satisfaction of any and all post-petition interest and attorneys fees CoBank claims it may be entitled to from the bankruptcy estate with regard to all matters being settled pursuant to this Application. As of June 30, 2001, Debtor estimated CoBank's stock had a value of $1,419,958.66. The parties have estimated that CoBank's post-petition interest through December 31, 2001, would be approximately $1,130,000 calculated at the contract non-default interest rate, and approximately $1,660,000 calculated at the contract default interest rate, and that through December 31, 2001, CoBank's attorneys fees would be approximately $300,000. CoBank reserves its rights to seek attorneys fees after the date of entry of an order approving this application solely in connection with any Lender Liability Claims filed against CoBank whether under its loan documents or otherwise; and the Debtor, Creditors' Committee and Equity Committee reserve their rights to oppose any such request. The parties agree that in the event CoBank is ultimately permitted to recover attorneys fees incurred in connection with the Lender Liability Claims, CoBank shall be entitled to seek payment of any such fees only from the entities bringing an action against CoBank, including *inter alia* the bankruptcy estate and the trust ("Trust") created pursuant to the liquidating plan of reorganization, as may be

5. *Docket No. 625.*

6. The Honorable John T. Flannagan, United States Bankruptcy Judge for the District of Kansas, now retired.

7. *Docket No. 717.*

amended (the "Amended Plan"), provided, however, that CoBank shall not be entitled to seek or obtain disgorgement of any funds paid to creditors or equity holders pursuant to the Amended Plan or the Trust, or from any funds disbursed under the Amended Plan or by the Trust pursuant to the terms of the Amended Plan.

. . . . .

d. CoBank shall not hold any secured or unsecured claims nor participate in any distributions to unsecured creditors in this case upon the requirements of Sections 9 a. and 9 b. being satisfied.

. . . . .

g. . . . .The Debtor, CoBank, the Creditors' Committee and the Equity Committee further agree that nothing contained in the Application is an admission that CoBank is or is not an oversecured creditor.[8]

On the day the Compromise Order was entered, the FCA paid CoBank $10,649,039.37 in cash, and returned the CoBank stock to CoBank.

Unfettered for the moment by its disputes with CoBank, the FCA turned its attention to the filing of a plan and disclosure statement in the Bankruptcy Case. On December 21, 2001, the FCA filed its First Amended Disclosure Statement to First Amended Liquidating Plan of Reorganization (the "Amended Disclosure Statement").[9] The Amended Disclosure Statement provides in part:

The Order approving the CoBank Settlement shall control the treatment afforded CoBank under the Plan, as may be amended. . . .On December 7, 2001, Debtor wire transferred to CoBank the

$10,649,039.37 and delivered to CoBank's counsel an original absolute stock transfer, thus fully performing Debtor's obligations pursuant to the CoBank Settlement.[10]

On that same date, the FCA filed its First Amended Liquidating Plan of Reorganization (the "Plan").[11] As one would expect from its name, the Plan called for the orderly liquidation of the assets owned by the FCA, with payments to creditors in order of priority. Under the Plan, the Trust was created to take possession of and liquidate the assets of the FCA. The Plan called for no additional payment to CoBank other than the monies and stock tendered pursuant to the Compromise Order. The Plan did not alter the terms of the Compromise Order in any way:

4.2.1 The Order approving the CoBank Settlement shall control the treatment afforded CoBank under this Plan, as may be amended. . . . .On December 7, 2001, Debtor wire transferred to CoBank the $10,649,039.37 and delivered to CoBank's counsel an original absolute stock transfer.

The Plan also limits the liability of the Trust on page 32:

6.13 *Liability of the FCA Post–Confirmation Trust.* Neither the FCA Post–Confirmation Trust, the Trustees, the Manager, the individual representatives nor any of their respective employees or agents shall be liable for the payment of any Estate liabilities, and no entity shall look to any of the foregoing parties for payment of such Estate liabilities or obligations.

On January 30, 2002, the bankruptcy court entered an Order Confirming the Debtor's

---

**8.** *Id.* at 3–5.

**9.** *Docket No. 738.*

**10.** *Id.* at 20.

**11.** *Docket No. 739.*

First Amended Liquidating Plan (the "Confirmation Order").[12] The Confirmation Order became final and non-appealable on February 12, 2002. On November 13, 2002, the FCA filed a Motion for Final Decree in this Chapter 11 proceeding.[13] On December 18, 2002, upon motion by the Trust, the bankruptcy court entered a Final Decree, finding that the Plan had been substantially consummated and ordering the case to be closed.[14]

### The Lender Liability Action

The completion of the bankruptcy process did not signal the end of litigation between CoBank, the FCA, and the Trust. On August 22, 2002, CoBank filed a Complaint for Declaratory Relief ("Declaratory Complaint") in the United States District Court for the District of Kansas (the "District Court") against the FCA and the Trust styled: *CoBank, ACB, v. The Reorganized Farmers Cooperative Association and FCA Post–Confirmation Trust*, Case No. 02–1300–JTM (the "Lender Liability Action").[15] CoBank based its claim of federal jurisdiction over the Lender Liability Action upon the diversity provisions found in 28 U.S.C.A. § 1332, and made no mention of the federal jurisdiction over bankruptcy cases and proceedings created under 28 U.S.C.A. § 1334. The Lender Liability Action was assigned to United States District Judge Thomas Marten.

In the Lender Liability Action, CoBank sought essentially the same remedy which it had sought from the bankruptcy court in the CoBank Adversary; namely, a declaratory judgment that neither the FCA nor the Trust held any valid lender liability claim against it. In its prayer for relief, CoBank specifically requested "a judgment awarding CoBank its costs and attorneys fees." In response to the Declaratory Complaint, the FCA and the Trust filed a counterclaim (the "Counterclaim") based upon various theories of lender liability. CoBank's Declaratory Complaint was subsequently dismissed. The FCA and the Trust acknowledged the jurisdiction of the federal court over the Counterclaim and elected to continue to pursue recovery in the District Court.

On October 4, 2002, CoBank filed a Motion to Dismiss two of the seven counts of the Counterclaim. The FCA and the Trust then filed a Motion for Judgment on the Pleadings on October 17, 2002. The motions were taken under advisement. In May of 2003, Judge Marten ruled that the FCA and the Trust should be allowed to litigate the Counterclaim.[16] The FCA and the Trust claimed damages against CoBank in the amount of $12,043,277.60, excluding punitive damages. On June 16, 2003, CoBank filed an answer to the Counterclaim, and requested that it be "awarded its costs and attorneys fees." On May 25, 2004, the parties in the Lender Liability Action submitted their final pretrial order to Judge Marten.[17] According to the Stipulation of Facts submitted by the parties in the matter *sub judice*, CoBank did not include a request for its attorneys' fees

---

12. *Docket No. 775.*

13. *Docket No. 879.*

14. *Docket No. 883.* The case has since been reopened. *See Docket No. 909.*

15. *Stipulation of Facts, Docket No. 958,* Exhibit G.

16. It appears that the Counterclaim may have been amended. For ease of reference, the Court uses the term "Counterclaim" to collectively refer to the original counterclaim and any amendments thereto.

17. *Stipulation of Facts, Docket No. 958,* Exhibit K.

in the Final Pretrial Order in the Lender Liability Action.[18]

On May 25, 2004, CoBank filed a motion for summary judgment and supporting memorandum as to the Counterclaim. In both its summary judgment motion and accompanying memorandum, CoBank did not request that it be awarded attorney's fees. On September 9, 2004, Judge Marten filed his Memorandum and Order granting CoBank's motion for summary judgment. A corresponding Judgment in a Civil Case was entered on September 15, 2004. Neither the Memorandum and Order nor the Judgment in a Civil Case awarded CoBank any attorneys' fees or costs. After the Memorandum and Order and Judgment were entered, CoBank did not seek an award of attorneys' fees pursuant to Fed.R.Civ.P. 54. The FCA and the Trust appealed the dismissal of their claims to the United States Court of Appeals for the Tenth Circuit. The appeal remains pending.

Between September 2002, the month when the FCA and the Trust filed the Counterclaim, and September 2004, when Judge Marten granted CoBank's motion for summary judgment, CoBank claims to have incurred legal fees and expenses in the amount of $691,927.84. CoBank contends that it is incurring additional ongoing fees and expenses in connection with the appeal. The Court has not been provided with any detailed information regarding these fees and expenses. Counsel for CoBank have indicated that such information is available to the Court and the other parties upon request.

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

### Conclusions of Law

CoBank seeks to recover fees and expenses from the Trust under § 506(b), which provides that

> (b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.[19]

Kansas bankruptcy courts have held that [t]his language establishes four prerequisites to an allowance of fees and costs: (1) the creditor must have an allowed

---

**18.** *Stipulation of Facts, Docket No. 958,* at 10 ¶ 29. The Court is a bit puzzled by this stipulation. As noted above, one of the exhibits which the parties submitted with the Stipulation was purportedly the Final Pretrial Order signed by Judge Marten in the Lender Liability Action. *Id.,* Exhibit K. The copy of the Final Pretrial Order submitted to this Court contains the following section:

> 8. Damages
>
> .    .    .    .    .
>
> c. Damages of CoBank.
>    As provided in Section 18 of the Master Loan Agreement dated January 31, 2000, CoBank is entitled to an award of its attorneys fees incurred in defending all of defendants' claims since they arise out of or are related to collection and enforcement of FCA's loan agreement with CoBank which FCA alleges CoBank breached in Count I of their counterclaim. CoBank's attorneys fees are ongoing and will be proven at trial.

*Id.,* Exhibit K, at 23. It would thus appear that CoBank raised the issue of its attorneys' fees in the Final Pretrial Order. However, both parties in this dispute are represented by able counsel. The Court presumes that these counsel know their case and know the facts of which they stipulate. Accordingly, the Court accepts the stipulation of the parties on this issue.

**19.** § 506(b).

secured claim; (2) the creditor must be oversecured; (3) the fees and costs must be provided for in the creditor's agreement with the debtor; and (4) the fees and costs sought must be reasonable.[20] At this stage of this litigation, the Court does not have before it any evidence as to whether CoBank is oversecured or whether the fees which it seeks are reasonable.[21] Those matters need be considered only if the Court concludes that, for purposes of § 506(b), CoBank currently holds an allowed secured claim in this bankruptcy case. If the answer to this question is no, the inquiry ends.

■ In determining whether CoBank holds an allowed secured claim, the parties have focused on § 506(b). While consideration of that section is essential, one also needs to apply the language of § 506(a) to the present dispute:

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.[22]

Under the language of § 506(a), in order to hold an allowed secured claim, an entity must qualify as a creditor. The term "creditor" is defined in § 101(10):

(10) "creditor" means-

(A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor;

(B) entity that has a claim against the estate of a kind specified in section 348(d), 502(f), 502(g), 502(h) or 502(i) of this title; or

(C) entity that has a community claim[.][23]

Unless one of the exceptions contained in § 101(10)(B) apply, in order to be a creditor, an entity must be the holder of a debt which arose prior to the filing of the bankruptcy case. As one of the leading treatises on the subject has noted,

"Creditor" is generally defined as a holder of one or more prepetition claims against the debtor. Under paragraph (A), *only holders of claims that arose prior to the commencement of the bankruptcy case are considered to be creditors.*[24]

---

**20.** *In re Biazo,* 314 B.R. 451, 460 (Bankr. D.Kan.2004) (citing *In re Kord Enterprises II,* 139 F.3d 684, 686–87 (9th Cir.1998)); *see also In re Krug,* 189 B.R. 948, 963 (Bankr. D.Kan.1995).

**21.** The parties have stipulated that "CoBank and the Trust agree that the parties are not stipulating to: (1) the validity, priority or extent of CoBank's claimed liens or alleged secured claims, (2) whether or not CoBank was on the petition date or is now an oversecured creditor, and (3) whether CoBank's legal fees and expenses referenced in Paragraph 35 hereof are reasonable." *Stipulation of Facts, Docket No. 958,* at 11 ¶ 36.

**22.** § 506(a).

**23.** § 101(10).

**24.** 2 KING ET AL., COLLIER ON BANKRUPTCY ¶ 101.10 (15th rev. ed.2004) (footnotes omitted) (emphasis added).

A significant body of case law supports this interpretation of the term creditor.[25] So does the legislative history behind the statute.[26] The thought that the term creditor as defined in bankruptcy cases should be limited in the main to prepetition claims is neither shocking nor illogical. As a general principle, bankruptcy cases deal with the treatment of debt which arose prepetition; postpetition claims are in most cases unaffected by the bankruptcy filing.[27]

■ In the present case, CoBank had a prepetition claim of $10,649,039.37. In addition, CoBank claimed to be entitled to postpetition interest, attorneys' fees, and costs under § 506(b). The viability of this claim was never adjudicated; instead, CoBank and the FCA settled their differences on all issues relating to the debt owed prior to the filing of the bankruptcy case. The settlement was approved by the bankruptcy court after proper notice to all affected parties. Under the terms of the settlement, CoBank was paid an amount in cash equal to the full amount of its prepetition claim. In addition, the FCA delivered to CoBank stock with a face value of $1,419,958.66, "in full and complete satisfaction of any and all post-petition interest and attorneys fees CoBank claims it may be entitled to from the bankruptcy estate with regard to all matters being settled pursuant to this application." [28] The Court concludes that, under the terms of the Compromise Order, the prepetition claim of CoBank was satisfied in full upon the payment of cash and surrender of stock by the FCA.[29] The conclusion that the prepetition claim of CoBank was fully satisfied is bolstered by the language in the Compromise Order which states that "CoBank shall not hold any secured or unsecured claims nor participate in any distributions to unsecured creditors in this case upon the requirements of Sections 9 a. and 9 b.

**25.** See, e.g., Hobson v. Travelstead (In re Travelstead), 227 B.R. 638, 647 (D.Md.1998); In re Woods, 316 B.R. 522, 528 (Bankr.N.D.Ill. 2004); PhyMatrix Mgmt. Co. v. Voltarel (In re Voltarel), 236 B.R. 464, 467 n. 1 (Bankr. M.D.Fla.1999); In re Serugo, 1994 WL 247286 (Bankr.E.D.Pa.1994); In re Southland Corp., 124 B.R. 211, 226 n. 37 (Bankr. N.D.Tex.1991); Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.), 56 B.R. 339, 398 (Bankr.D.Minn. 1985); Vaccariello v. Lagrotteria (In re Lagrotteria), 42 B.R. 867, 869 (Bankr.N.D.Ill. 1984); In re Overmyer, 26 B.R. 755, 757 (Bankr.S.D.N.Y.1982).

**26.** See H.R. REP. No. 95–595, at 309 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6266; See S. REP. No. 95–989, at 22 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5808, 6266 (" 'Creditor' is defined to include only holders of prepetition claims against the debtor.").

**27.** See, e.g., § 362(a)(1) (limiting the automatic stay provisions to attempts "to recover a claim that arose before the commencement of the case"); § 727(b) (limiting the discharge injunction to "all debts that arose before the date of the order for relief under this chapter"); § 1141(d)(1)(A) (same); § 1228(a) (limiting the scope of discharge to those claims provided for under the plan); § 1328(a) (same).

**28.** Compromise Order, Docket No. 717, ¶ 9(b).

**29.** This conclusion renders Mfrs. Nat'l Bank v. Auto Specialties Mfg. Co. (In re Auto Specialties Mfg. Co.), 18 F.3d 358 (6th Cir.1994), a case relied upon by CoBank, inapplicable to the case at bar. In Auto Specialties, there was no dispute that the bank seeking a fee award held an unpaid prepetition fully secured claim. Id. at 360. In this case, CoBank was not the holder of an allowed secured claim at the time the fees at issue were incurred, rendering both § 506(b) and Auto Specialties inapplicable. The conclusion that CoBank no longer holds an allowed secured claim also renders inapplicable the cases cited by CoBank which hold that the value of a secured claim is determined as of the date of the filing of the petition. See, e.g., In re Embassy Props. N. Ltd. P'ship, 196 B.R. 172 (Bankr.D.Kan. 1996); Donahue v. Parker (In re Donahue), 110 B.R. 41 (Bankr.D.Kan.1990).

**504**

being satisfied." [30]

CoBank admits that the fees which it now seeks arose post-petition; indeed, it is undisputed that these fees arose well after the bankruptcy case of the FCA was initially closed. Notwithstanding these facts, CoBank argues that the lender liability fees relate back to CoBank's prepetition claim. In making this argument, CoBank relies upon that portion of the Compromise Order which stated that CoBank would not "hold any secured or unsecured claims nor participate in any distributions to unsecured creditors in this case upon the requirements of Sections 9a. and 9b. being satisfied." CoBank claims that this provision would not become effective so long as the specter of lender liability claims hung over it.[31] In other words, CoBank contends that, even though its entire prepetition claim, as well as its entitlement to postpetition interest and attorneys fees was settled and paid in full, it held a secured claim against the bankruptcy estate of the FCA so long as there was any possibility that the FCA and/or the Trust could assert a lender liability claim against CoBank. The Court disagrees.

The Compromise Order can be split into two parts: the disputes which it settled and the disputes which it did not settle. Under its terms, CoBank received cash and stock in full satisfaction of its prepetition claim; namely, the monies which it claimed to be owed in principal, interest, attorneys' fees, and costs by virtue of the money which it loaned to the FCA. There is nothing in the Compromise Order which preserved any portion of CoBank's prepetition claim. That claim has been satisfied in full.[32] The parties could not settle the issue of whether CoBank was liable to the FCA on various lender liability theories. On that issue, the parties agreed to disagree. The FCA did not release its claims, and CoBank did not release its right to seek fees *if such claims were brought*. Any claim which CoBank may hold against the FCA and/or the Trust is a post-petition claim. The holder of a post-petition claim is not a creditor for purposes of § 506 of the Bankruptcy Code. This fact, standing alone, dooms the Motion. The Court need consider none of the other issues raised by CoBank pertaining to § 506(b).

In the alternative, CoBank argues that its claim for fees arising out of the Lender Liability Action should be given administrative claim status under § 503(b)(1)(A), which provides an administrative priority for "the actual, necessary costs and expenses of preserving the es-

---

**30.** *Compromise Order, Docket No. 717,* ¶ 9(d). In addition, simple mathematics support the Court's conclusion. According to the Compromise Order, CoBank was owed $10,649,039.37 on the date the FCA filed its bankruptcy case. In addition, CoBank claimed between $1,130,000.00 and $1,660,000.00 in postpetition interest, depending upon the applicable default rate, and an additional $300,000.00 in attorneys' fees. The latter items were the subject of dispute. The sum of these three numbers is between $12,079,000.00 and $12,609,039.00. If one adds the amount of cash paid to CoBank to the face value of the stock, the total amount paid by the FCA to CoBank is $12,068,998.03. Put simply, the parties cut a deal.

**31.** *See Memorandum in Support of CoBank's Motion to Permit Filing, Allowance and Payment of Claim for Post–Confirmation Attorneys Fees, Docket No. 963,* at 17–18 ("CoBank did not release its secured claim insofar as the FCA reserved its right to pursue Lender Liability Claims and CoBank reserved its right to seek recovery of its attorneys fees incurred in connection with such claims.").

**32.** CoBank has titled its motion "Motion to Permit Filing, Allowance, and Payment of Claim for Post–Confirmation Attorneys Fees." This title implies the filing of a *new claim,* rather than the allowance of an old one.

tate."[33] While CoBank cites varying authorities for its position, none emanate from our circuit. The United States Court of Appeals for the Tenth Circuit has adopted a two prong test for determining whether a claim is entitled to administrative priority.[34] Under the two prong test the expense (1) must have arisen from a transaction with the estate, i.e., must be a post-petition transaction; and (2) the estate must have benefitted in some demonstrable way, i.e., the expense must have been necessary to preserve the estate.[35] An expense which does not benefit the estate cannot be considered a necessary expense.[36] The focus is upon whether the estate received a benefit, as opposed to whether the creditor might experience a loss.[37]

■ In the present case, there is nothing in the record which would establish that the FCA benefitted from the fees incurred by CoBank. The fact that CoBank suffered a detriment is not enough to provide it with an administrative priority claim. The Court thus rejects CoBank's argument that it is entitled to an administrative priority claim for the fees incurred in the Lender Liability Action.[38]

■ Two additional factors cause the Court to take pause in considering CoBank's request for fees under the Motion.

The Court has some concern with its jurisdiction over litigation commenced after the closing of the FCA Chapter 11 case. The Motion contains a somewhat cryptic allegation that this Court has jurisdiction over the Motion "pursuant to 28 U.S.C. §§ 1334 and 157." CoBank has provided the Court with no detail regarding the exact portion of these statutes upon which it relies. In the Plan, while the FCA asked the bankruptcy court to retain jurisdiction over various matters, potential lender liability claims were not included.[39] Neither CoBank nor the Trust premised federal court jurisdiction over the Lender Liability Action upon any theory of bankruptcy jurisdiction; instead, they both relied upon the diversity provisions of 28 U.S.C.A. § 1332.[40] CoBank demonstrated its belief that the District Court had jurisdiction over its request for fees when it asked that Court to award those fees. Whatever obligation the Trust may owe to CoBank as a result of the Lender Liability Action arose after the bankruptcy process was complete. Absent a stronger showing of this Court's jurisdiction, the Lender Liability Action, including any award of fees related thereto, is best left in the hands of the District Court.

The Court also believes that all issues relating to the award of attorneys' fees in the Lender Liability Action should be re-

**33.** § 503(b)(1)(A).

**34.** *Gen. Am. Transp. Co. v. Martin (In re Mid Region Petroleum, Inc.)*, 1 F.3d 1130 (10th Cir.1993); *see also Isaac v. Temex Energy, Inc. (In re Amarex, Inc.)*, 853 F.2d 1526, 1530 (10th Cir.1988).

**35.** *In re Mid Region Petroleum Inc.*, 1 F.3d at 1132–1133.

**36.** *Id.* at 1133.

**37.** *Id.* at 1132.

**38.** CoBank did not seek an administrative priority claim in the Motion, raising the issue only in its briefs submitted after the parties had submitted their stipulations of fact and supporting exhibits to the Court. The Court looks with disfavor upon the advancing of new theories of recovery in closing briefs.

**39.** *See Stipulation of Facts, Docket No. 958,* Exhibit E (Plan), at 40—41.

**40.** This is the section which grants federal courts jurisdiction over disputes involving more than $75,000 when diversity of citizenship exists between the parties. *See* 28 U.S.C.A. § 1332(a).

solved in the District Court under the principles of comity and judicial efficiency. Although CoBank requested an award of its fees and expenses at the inception of the Lender Liability Action, it did not include such a request in either the Final Pretrial Order or its motion for summary judgment. Moreover, after prevailing on the motion for summary judgment, Co-Bank did not seek an award of fees from the District Court under Federal Rule of Civil Procedure 54. The Trust has argued that CoBank's conduct in this regard is tantamount to a waiver of any entitlement to fees. The District Court is in the best position to determine whether the fees and expenses sought are reasonable, and whether CoBank has somehow waived its right to fees through its failure to include the request in the Final Pretrial Order and/or through its failure to timely file a motion for fees under Federal Rule of Civil Procedure 54. This Court will not usurp the province of the District Court or create piecemeal litigation on the fee issue.[41]

The ruling of the Court today is limited to a finding that CoBank has no right to seek an award of fees and expenses in the Lender Liability Action by asserting that it is an oversecured creditor for purposes of § 506 of the Bankruptcy Code. The Court is not intending to limit the ability of the District Court to consider an award of fees for either party. The District Court is free to act in whatever manner it deems appropriate.[42]

## Conclusion

The Motion to Permit Filing, Allowance, and Payment of Claim for Post–Confirmation Attorneys Fees filed by CoBank, ACB is denied without prejudice to the rights of CoBank, ACB, if any, to pursue collection of fees and expenses before the District Court. A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

## JUDGMENT

Presently before the Court is the Motion to Permit Filing, Allowance, and Payment of Claim for Post–Confirmation Attorneys Fees filed by CoBank, ACB. The issues having been duly considered and a decision having been duly rendered, for the reasons set forth in the Memorandum Opinion filed concurrently herewith,

IT IS HEREBY ORDERED that the Motion to Permit Filing, Allowance, and Payment of Claim for Post–Confirmation Attorneys Fees filed by CoBank, ACB be, and the same hereby is, denied.

41. Even if CoBank somehow had a right to ask this Court to assess fees under § 506(b), the Court would not consider an award under § 506(b) unless and until the District Court awarded fees to CoBank.

42. The Court's decision is entirely consistent with the decision reached by the United States Court of Appeals for the Eleventh Circuit in *Shure v. Vermont (In re Sure–Snap Corp.)*, 983 F.2d 1015 (11th Cir.1993), a case heavily relied upon by CoBank. In *Sure–Snap*, the Eleventh Circuit upheld the creditor's right to seek an award of fees as a prevailing party in litigation which took place post-confirmation. The Court is making the same ruling today, but directing CoBank to seek those fees from the Court where the litigation took place.